BERNARD A. LEVIN AND PHYLLIS LEVIN, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

ALAN T. HRABOSKY AND DELORES Y. HRABOSKY, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 19971-83, 19999-83.     Filed September 29, 1986.

*Sheldon Chertow*, *Lloyd E. Shefsky*, *Martin M. Lucente*, *Jr.*, *Clifford E. Yuknis*, and *Joel J. Sprayregen*, for the petitioners.

*Thomas C. Borders* and *William E. Bogner*, for the respondent.

SIMPSON, *Judge*: The Commissioner determined deficiencies in the petitioners' Federal income taxes for 1979 as follows:

| Docket No. | Petitioner | Deficiency |
|---|---|---|
| 19971-83 | Bernard A. and Phyllis Levin | $18,633 |
| 19999-83 | Alan and Delores Hrabosky | 61,976 |

The issues for decision are: (1) Whether the expenditures by certain partnerships formed for the stated purpose of developing, manufacturing, and marketing certain food-packaging machinery were paid or incurred in connection with a trade or business within the meaning of section 174 of the Internal Revenue Code of 1954[1]; and (2) whether the interest on certain long-term obligations payable in Israeli currency is deductible.

## FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.[2]

When they filed their petitions in these cases, the petitioners Bernard A. and Phyllis Levin, husband and wife, resided in Skokie, Illinois, and the petitioners Alan and Delores Hrabosky, husband and wife, resided in Lithonia, Georgia. Mr. and Mrs. Levin and Mr. and Mrs. Hrabosky filed their Federal income tax returns for 1979 with the Internal Revenue Service Center, Kansas City, Missouri.

In 1972, Ihor Wyslotsky, a mechanical engineer and an expert in the design of packaging machinery, founded Thermoplastics Engineering Co., Inc. (TEC). TEC, an Illinois corporation, was headquartered in Posen, Illinois, until 1979, when the company was reincorporated under the laws of the State of Delaware as TEC, Inc., and its administrative, engineering, and manufacturing facilities were moved to Alsip, Illinois. During its first 6 years, TEC designed and manufactured specialized and highly sophisticated packaging machinery for customers in the food and pharmaceutical industries. Each piece of equipment was one of a kind,

---

[1] All statutory references are to the Internal Revenue Code of 1954 as in effect during the year in issue.

[2] On brief, the petitioners have occasionally relied on answers to certain interrogatories to support an argument. Under Rule 70(d) of the Tax Court Rules of Practice and Procedure, answers to interrogatories "will not be considered as evidence" and are admissible "to the extent permitted by the rules of evidence." We decline to make findings of fact based on the answers to interrogatories cited by the petitioners because such answers have not been offered and received into evidence. Moreover, the Commissioner has not been offered an opportunity to examine the party who answered the interrogatories.

being designed to meet the particular needs of the customer. The projects usually were funded by the customer on a fixed-price basis. TEC customers during this period included Carl Buddig & Co., 3M Co., Abbott Laboratories, Baxter Travenol Laboratories, Inc., and Rexham Corp.

In 1975 or 1976, Mr. Wyslotsky sold a 25-percent interest in TEC to Lloyd Shefsky. Mr. Shefsky, a member of the Chicago law firm of Shefsky, Saitlin & Froelich, Ltd., and a certified public accountant, was legal counsel to Mr. Wyslotsky, TEC, and TEC-affiliated companies. By 1979, Mr. Wyslotsky owned 51 percent and Mr. Shefsky owned 49 percent of TEC's outstanding shares of stock.

Together, Messrs. Wyslotsky and Shefsky developed a long-range plan for TEC. They decided that TEC should use its expertise in the design of specialized packaging machines to develop a series of standardized, mass-producible packaging machines. The machines would incorporate the newest technologies (such as lasers and microprocessors) to achieve greater efficiencies and cost savings in the packaging of food and pharmaceuticals, processes which theretofore had been highly inefficient and not innovative. Initially, TEC would focus on machines for the meat packing industry because that industry had high packaging costs and very low profit margins; any packaging cost savings would translate directly into significantly higher profits, making TEC's machines attractive to the industry. TEC planned, eventually, to modify its packaging machines for use in the cheese and pharmaceutical industries.

In 1977 and 1978, TEC used its own funds to develop the TEC 1001, a high-speed vacuum packaging machine for luncheon meats and frankfurters. TEC began manufacturing and selling the TEC 1001 in 1978. TEC did not have the substantial amounts of money needed to develop the other machines which were to form its product line. TEC investigated the possibility of financing the development through financial institutions and certain Government programs in the United States and Israel, but for various reasons, its attempts to secure such funding were unsuccessful. At Mr. Shefsky's suggestion, TEC eventually decided to raise the necessary funds through "off-balance-sheet" financing. The general features of this financing technique were described

as follows in a "Report and Investment Proposal" prepared by TEC in December 1980:

### FINANCING TECHNIQUES

On several occasions in the past, the company has allowed individual investors or groups of investors to contract with the company for the development of particular equipment or systems. Typically, these contracts entailed agreements whereby the investors would generate the cash necessary for the development of the desired equipment and systems, and, subsequently would own all right, title and interest to that equipment. Therefore, a substantial portion of the TEC product line technically is owned by outside investors and investor groups. TEC has long-term (40 years) contracts with these outside investors and investor groups, whereby TEC is granted total and exclusive manufacturing and marketing rights. The income accruing to the outside investors and investor groups have not been reflected in the projected financial statements included in this report, and would not accrue to the benefit of TEC.

The development investment programs were structured in an attempt to provide maximum tax incentives to the investors.

In 1978, TEC used its off-balance-sheet financing technique to obtain development funds for three projects: (1) The slice, weigh, and pack (SWAP) system for bacon packaging; (2) the dieless vacuum packaging system, which would produce semi-rigid and flexible packaging for a variety of products; and (3) the tent-pak system, which would produce a recloseable package for luncheon meat and cheese. The outside investors who provided the money for the development of these three systems entered into development, manufacturing, and marketing agreements with companies owned by or affiliated with (through common ownership by Messrs. Wyslotsky and Shefsky) TEC and incorporated in the United States.

TEC obtained development funds for additional packaging machine systems in a slightly different fashion in the 4 years following 1978. The individual American investors purchased limited partnership interests in Israeli partnerships, which, in turn, entered into development, manufacturing, and marketing agreements with Israeli companies (including TEC affiliates) for particular pieces of equipment that TEC wished to add to its product line. The structure of the research and development investments involved in the

present case was typical of those promoted by TEC in 1979 and thereafter.

Dispoard (Israel) & Co. (Dispoard) was organized as an Israeli limited partnership, and Labless (Israel) & Co. (Labless) was organized as an Israeli general partnership, in December 1979. Both partnerships are to terminate in the year 2009, unless sooner terminated by a vote of the partners or upon the occurrence of certain stated events.

Dispoard had one general partner, Mimi J. Ben-Gershon, an Israeli citizen, and nine limited partners. A total of $255,000 was contributed to the capital of Dispoard; $138,000 was contributed in 1979 and $117,000 was contributed in 1980. The general partner made no capital contribution. The limited partners subscribed for a total of 138 "class A" units and 117 "class B" units at a price, which was stated in U.S. dollars, of $1,000 each. The price of the class A units was payable upon subscription, and the price of the class B units was payable upon notification that an engineering benchmark had been reached in the development of a bacon board dispenser, which event was expected to occur in May 1980. According to Dispoard's private placement memorandum, the partnership's entire capital of $255,000 was to be expended as follows:

*Use of proceeds*

| | |
|---|---:|
| Development fees (including legal fees of $20,000) ... | $228,000 |
| Financial advisory fees ............................ | 20,000 |
| General partner's compensation and office expense .. | 1,000 |
| Other expenses................................... | 6,000 |
| Total ......................................... | 255,000 |

Labless had four general partners: Taryl B.G., Ltd. (Taryl), and three Israeli limited partnerships. Taryl, an Israeli corporation,[3] was organized shortly before Labless was formed. The record does not reveal the owner or owners of Taryl. Ms. Ben-Gershon signed the partnership agreement on behalf of Taryl. The three limited partnerships were named Labless Achad & Co. (Achad), Labless Shtayim & Co. (Shtayim), and Labless Shalosh & Co. (Shalosh). Ms. Ben-Gershon was the general partner of each of the limited partnerships. The limited partners of Achad, Shtayim, and

---

[3]The term "corporation" does not exist under Israeli law. However, the Israeli limited companies involved in this case were essentially equivalent to corporations, and for convenience, we shall refer to them as such.

Shalosh subscribed for a total of 632 "class A" and "class B" units at a price, which was stated in U.S. dollars, of $1,000 each. The price of the class A units was payable upon subscription, and the price of the class B units was payable upon notification that certain engineering benchmarks had been reached in the development of a label dispenser and applicator (labeler) and a semi-rigid materials thermoformer system (thermoformer), which benchmarks were expected to be reached in May 1980. The limited partnerships contributed a total of $632,000 to the capital of Labless, as follows:

|  | Achad | Shtayim | Shalosh |
|---|---|---|---|
| 1979 capital contribution (class A units) | $107,000 | $93,000 | $89,000 |
| 1980 capital contribution (class B units) | 126,000 | 100,000 | 117,000 |

Taryl made no capital contribution to Labless, and Ms. Ben-Gershon made no capital contributions to the limited partnerships. According to Labless' private placement memorandum, its entire capital of $632,000 was to be expended as follows:

*Use of proceeds*

| | |
|---|---|
| Development fees (including legal fees of $50,000)... | $542,000 |
| Sales commissions ............................... | 42,000 |
| Reserve for patents and tax defense............... | 34,000 |
| General partner's compensation and office expense.. | 3,000 |
| Other expenses ................................... | 11,000 |
| Total........................................... | 632,000 |

Because the sole activity of Achad, of Shtayim, and of Shalosh was to invest in Labless, we shall hereinafter, for convenience, refer to Ms. Ben-Gershon as the general partner of Labless and to their limited partners as partners in Labless.

In 1979, the petitioner Alan Hrabosky subscribed for 30 class A units and 15 class B units in Dispoard, and the petitioner Bernard A. Levin subscribed for 10 class A units and 1 class B unit in Labless. Incident to acquiring such units, each petitioner was required to sign a subscription agreement whereby each agreed, in pertinent part:

to be personally liable to the Developer under the Development Agreement[4] to be entered into between the Venture and the Developer for a

---

[4]This read "Development Agreements" in the Labless subscription agreements.

portion of the Development Fees·designated as Periodic Payments being paid no later than January 31, 1994.[5] That portion of the Undersigned's liability for such fees shall be limited to an amount equal to the sum of (i) the number of the Undersigned's Class A Units times 85,714 Israeli Pounds; plus (ii) the number of the Undersigned's Class B Units times 104,348 Israeli Pounds. (For comparative purposes, at present exchange rates, approximately 33 Israeli Pounds are equivalent to One Dollar[.]) Any amount which the Undersigned is required to pay to creditors of the Venture, to contribute to the Venture, or to pay to any other person as a result of his personal liability hereunder shall constitute an additional capital contribution to the Venture.[6]

The Dispoard and Labless partnership agreements granted Ms. Ben-Gershon, as general partner, full, exclusive, and complete authority and discretion in the management and control of the affairs of the partnerships. For 2½ years after the formation of the partnerships, she was to receive a monthly fee for supervising the partnerships' affairs. In addition, she was entitled to 1 percent of each partnership's net profits and losses. The record contains no evidence of Ms. Ben-Gershon's educational or business qualifications beyond the facts that she was an Israeli citizen and that she was the general partner of every Israeli partnership promoted by TEC. She did not testify at the trial of this case.

The partnership agreements of both Dispoard and Labless recited that they were formed for the purpose of engaging in the business of developing, manufacturing, and marketing food-packaging machinery and equipment. However, the partnerships' private placement memorandums explained that Dispoard's business was to be limited to the development, manufacture, and marketing of the bacon board dispenser, and that Labless' business was to be limited to the development, manufacture, and marketing of the labeler and the thermoformer if, as occurred, investors subscribed for 632 partnership units.

The bacon board dispenser was intended to produce and to dispense a bacon board that Mr. Wyslotsky had invented and for which he obtained a patent in 1981. (He applied for the patent in October 1979.) A bacon board is a stiff piece

---

[5]Under the development agreements as executed, only 50 percent of the periodic payments was payable by Jan. 31, 1994; the remaining 50 percent was due by Jan. 15, 1995. See text p. *infra.*

[6]This read "capital contribution to the Partnership" in the Labless subscription agreements.

of plastic onto which bacon is deposited during the bacon slicing operation. The proposed bacon board dispenser was to feed rollstock bacon board material into a simple reciprocating cutting head that would produce the board, and then it was to feed the cut boards on demand directly under the delivery end of the output conveyer of the bacon slicer.

The labeler was to apply labels, a pre-printed band of film, to the flexible packaging material used on a packaging machine. The band of film was to be fused to the packaging material with temperature-sensitive adhesives so as to become an integral part of the packaging material.

The thermoformer was intended to be an optional accessory to the dieless machine. The thermoformer was to form a semi-rigid package of uniform thickness using thinner-gauge plastics than is required by existing thermoforming technology, thereby reducing film waste. Four sub-systems would comprise the thermoformer system: a pressure former, a vacuum former, a microprocessor, and software. The microprocessor was to be equipped to receive various computer programs (the software) for different applications of packaging films. Together, the software and microprocessor would control all aspects of the thermoforming process.

On December 19, 1979, Dispoard entered into a set of agreements relating to the bacon board dispenser, and Labless entered into two sets of agreements, the first set relating to the labeler and the second set relating to the thermoformer. Each set included the following agreements: (1) A development agreement, (2) a manufacturing agreement, and (3) a marketing agreement. The sets of agreements are virtually identical, the chief differences being the machine to be developed and the amounts of the development, manufacturing, and marketing fees. In all of the agreements, the machine involved (bacon board dispenser, labeler, or thermoformer) was referred to as a "system."

Under the development agreements, Development & Manufacture Control Ltd. (DMC), an Israeli corporation, agreed to provide Dispoard and Labless with research and development services, technical documentation, and a single operating prototype model of each system,

which may be suitably constructed to be capable of functioning as part of an overall group of materials handling and packaging machinery and equipment as may be required by Owner's [the partnership] first customer for the System. It is further contemplated and agreed that, while said prototype shall be usable within such group of machinery and equipment, the System shall be adaptable, with minor modifications, to the full spectrum of functions and capacities set forth

in an attached description of the system. DMC further agreed to indemnify each partnership from any claim or liability arising out of the use of the system(s) by any purchaser or licensee, or arising from or by reason of any actual or claimed infringement of any patent, trademark, or copyright, provided DMC was promptly notified of the infringement allegation and was given the opportunity to assume sole control over the defense or compromise of the infringement action. DMC also agreed to provide each partnership with quarterly progress reports on the results of its activities. While DMC was required to use its "best efforts to complete the development of the System," the parties to the agreement "understood and agreed that such completion shall be satisfied by Developer's [DMC] best efforts, including the expenditure of the amounts payable by Owner pursuant to the terms and provisions of this Agreement." The development agreements gave Dispoard and Labless no power to supervise the activities of DMC with respect to their systems.

In return for its services, DMC was to be paid development fees as follows:

|  | DISPOARD | LABLESS | |
| --- | --- | --- | --- |
|  | Bacon board dispenser | Labeler | Thermoformer |
| First stage: | | | |
|   Initial payment | [7]I£4,020,000 | I£4,288,000 | I£3,752,000 |
|   Periodic payments | 11,558,000 | 12,868,000 | 11,336,000 |
| Total first stage fees | 15,578,000 | 17,156,000 | 15,088,000 |
| Second stage: | | | |
|   Initial payment | 4,536,000 | 6,804,000 | 5,880,000 |
|   Periodic payments | 12,285,000 | 19,148,000 | 16,868,000 |
| Total second stage fees | 16,821,000 | 25,952,000 | 22,748,000 |
| Total development fees | 32,399,000 | 43,108,000 | 37,836,000 |

All payments due DMC under the development agreements were payable in Israeli pounds or, in the event Israel

---

[7]Israeli pound.

changed its official currency, in such subsequent Israeli currency. If the currency was changed, any amounts due would be restated in the new currency using the conversion terms established by the Israeli Government.

The first stage initial payment was due on December 20, 1979. Payment of the second stage development fees (initial and periodic payments) was contingent upon completion of the "Second Stage Benchmark," which for all three systems was the completion of soft engineering.[8] According to the partnerships' private placement memorandums, such benchmark for all three systems was expected to be reached in May 1980. The first stage periodic payments and (if the benchmark was obtained) the second stage periodic payments, together with accrued interest thereon, were payable from "all gross revenues received by or on behalf of Owner from the sale, (net of sales, use, and similar taxes and returns and allowances) lease, license, transfer, assignment or other disposition or exploitation of the System" at the "Payment Percentage" rate set forth in each agreement. Such rate was as follows for the three systems:

|  | *Payment percentage* |
|---|---|
| Dispoard | |
| Bacon board dispenser | 21 |
| Labless | |
| Labeler | 16 |
| Thermoformer | 15 |

The development fees bore interest at the rate of 10 percentper annum in 1979, 1980, and 1981, and 8 percent per annum in 1982 and thereafter, commencing on the date the obligation to pay such fees arose and accruing until such fees were paid. Any payments made pursuant to the development agreements were to be applied first to the interest and thereafter to the fees due.

Dispoard and Labless were in any event unconditionally obligated to pay 50 percent of the periodic payments, and any accrued but unpaid interest thereon, by January 31, 1994, and the remaining 50 percent of such payments and interest by January 15, 1995. Moreover, the development agreements provided:

---

[8]"Soft engineering" refers to the devising of ideas or concepts, and it precedes the preparation of drawings and bills of materials.

5. *Payment.*

     *      *      *      *      *      *      *

IV. As a condition of Developer's willingness to receive payment of the Total Development Fees from time to time, as provided in this Agreement, Owner covenants to require each limited partner of Owner to become personally responsible for a portion of the Total Development Fees due Developer hereunder. The liability of each limited partner shall be limited to that portion of the Total Development Fees equal to the limited partner's percentage interest in Owner.[9]

DMC's right to receive the development fees payable under each agreement was secured by a security interest in, and general lien upon, the system covered by the agreement and the products and proceeds of the system's use and exploitation. Each development agreement was to terminate by January 15, 1995.

In 1980, the State of Israel changed its official currency from the pound to the shekel. At the official conversion rate of 10 pounds to 1 shekel, the partnerships' liabilities to DMC for the periodic payments converted to shekels (IS) as follows:

|  | DISPOARD | LABLESS | |
|---|---|---|---|
|  | *Bacon board dispenser* | *Labeler* | *Thermoformer* |
| First stage: | | | |
|   Periodic payments | IS1,155,800 | IS1,286,800 | IS1,133,600 |
| Second stage: | | | |
|   Periodic payments | 1,228,500 | 1,914,800 | 1,686,800 |
| Total periodic payments | 2,384,300 | 3,201,600 | 2,820,400 |

Under the manufacturing agreements, each partnership granted TEC Packaging (Israel), Ltd. (TEC Packaging), an Israeli corporation, the exclusive right to manufacture its system(s). Each agreement was effective upon execution and was to terminate on December 31, 2027. For manufacturing a system, TEC Packaging was to be paid a percentage of each system's "Suggested Retail Price":

|  | *Percentage* | *Initial suggested retail price* |
|---|---|---|
| Dispoard | | |
|   Bacon board dispenser | 44 | I£1,507,500 |
| Labless | | |
|   Labeler | 53 | 1,005,000 |
|   Thermoformer | 55 | 1,273,000 |

[9] In Labless' development agreements for the labeler and the thermoformer, the first sentence of sec. 5.IV. read "each limited partner *of the participants* of Owner," and the second sentence of such section read "the limited partner's *effective* percentage interest." (Emphasis added.)

Paragraph 4 of each agreement provided that such manufacturing cost was to be paid in installments of 30 percent upon order, 60 percent upon physical delivery and inspection of the system, and 10 percent within 30 days of installation and acceptance of the system. If the partnership received payments from its customers in excess of the installments required to be paid TEC Packaging, such excess, less any commissions, was to be paid to TEC Packaging until it had received 90 percent of the manufacturing cost. Each manufacturing agreement further provided that the suggested retail price established in the agreement could not be reduced by more than 5 percent during any 12-month period without TEC Packaging's prior written consent. Finally, TEC Packaging was not obligated to manufacture a system if its price fell below a price at which it was "commercially practical" for TEC Packaging to manufacture the system. If TEC Packaging elected not to manufacture under such circumstances, the partnership could retain another manufacturer, but only if the other manufacturer charged no more than TEC Packaging.

Under the marketing agreements, each partnership granted TEC Packaging the exclusive, worldwide right to market its system(s) either directly or through the use of agents, independent contractors, or representatives. Each partnership agreed that it would not, during the term of the marketing agreement, market or use, or authorize any other person, firm, or entity to market or use the system or any part thereof. TEC Packaging was obligated to use its best efforts to actively build, maintain, and expand the market for each system. It was also obligated to pay all marketing costs and expenses that it incurred.

In return for its marketing services, TEC Packaging was to receive, as a sales commission, an amount equal to 15 percent (the initial percentage) of an initial amount (the marketing achievement level) of the gross revenues received by, or collected on behalf of, each partnership from the marketing of its system. When the marketing achievement level for each system was reached, TEC Packaging's sales commission was to rise to a greater percentage (the achievement percentage) of the system's gross revenues.

The systems' marketing achievement levels and achievement percentages were as follows:

|  | Marketing achievement level | Achievement percentage |
|---|---|---|
| Dispoard | | |
| Bacon board dispenser | I£155,925,000 | 27 |
| Labless | | |
| Labeler | 276,375,000 | 27 |
| Thermoformer | 308,736,000 | 25 |

TEC Packaging was authorized to collect all gross revenues and to pay from such revenues all manufacturing costs, on behalf of each partnership. After it had received sufficient revenues to completely pay for the manufacturing costs, TEC Packaging was entitled to withhold its commissions and then to remit the balance of the revenues to the partnership. The marketing agreements were effective upon execution and were to terminate on December 31, 2008.

Each development, marketing, or manufacturing agreement expressly provided that no agency, partnership, or joint venture was to exist between the parties to the agreement.

On the same day as the partnerships entered into the development agreements with DMC and the manufacturing and marketing agreements with TEC Packaging, DMC and TEC Packaging executed a consulting agreement with respect to each of the development agreements. Under the consulting agreement, TEC Packaging agreed "to use its best efforts to assist Developer [DMC] to complete the development" of a system by providing technical services and documentation, and by assisting DMC in the construction of a prototype model of the system. TEC Packaging further agreed to furnish DMC with quarterly progress reports of its activities. In return for such services, DMC agreed to pay TEC Packaging a consulting fee, payable in Israeli pounds (or subsequent Israeli currency) of 95 percent of all development fees payable to DMC pursuant to each development agreement less (1) reasonable direct expenses incurred by DMC in connection with the project and (2) payments made to Israeli subcontractors other than TEC Packaging. The consulting fee was due no later than 5 days after DMC received the development fees. Each consulting

agreement was to terminate upon completion of a prototype model, which for all three systems was to be no later than December 31, 1981.

On or about May 30, 1980, DMC and TEC Packaging amended the consulting agreements to provide that TEC Packaging was to be paid the following consulting fees in lieu of those specified in their original agreements: (a) 95 percent of the initial payments payable to DMC pursuant to the development agreements less (1) reasonable direct expenses incurred by DMC in connection with the projects and (2) payments made to Israeli subcontractors other than TEC Packaging; and (b) 100 percent of the periodic payments payable to DMC pursuant to the development agreements less "such reasonable compensation to be agreed upon by the parties at the time of said payments." By September 1980, DMC and TEC Packaging agreed that "such reasonable compensation" would amount to 5 percent of the periodic payments, so that DMC would pay TEC Packaging 95 percent of the deferred payments.

TEC Packaging was organized and owned in 1979 by Messrs. Wyslotsky and Shefsky. TEC Packaging used the cash method of accounting. It was established because Mr. Wyslotsky felt that TEC should maintain a presence in Israel. TEC had begun subcontracting development work on the SWAP and dieless systems with an Israeli engineering firm in 1978, and Mr. Wyslotsky planned to subcontract some of the work on the bacon board dispenser, labeler, and thermoformer to Israeli firms. Mr. Wyslotsky intended TEC Packaging to oversee the development projects and, eventually, to manufacture the developed products in Israel and to export them from Israel to the United States and Europe. His objective was to develop and manufacture the high-technology components of TEC's packaging systems in Israel because engineering expertise was readily available at a lower cost in Israel and because the Government of Israel offered financial assistance to manufacturers.

On the advice of TEC's Israeli lawyers and accountants, it was later decided that the manufacturing would be done by an Israeli corporation using the accrual method of accounting; TEC Equipment (Israel), Ltd. (TEC Equipment), was officially registered as an Israeli corporation in January 1980 and, at that time, was owned by Messrs. Wyslotsky

and Shefsky. Subsequently, in 1981, they assigned their interests in TEC Equipment and TEC Packaging to TEC. In 1983, the partnerships, TEC Packaging, and TEC Equipment entered into an "assumption and release" agreement with respect to each manufacturing agreement whereby TEC Equipment assumed, with the partnerships' approval, all of TEC Packaging's rights and duties under the manufacturing agreement.

DMC was formed in December 1979 and used the accrual method of accounting. The company was owned by two brothers, Itzhak and Shmuel Bezalel, and members of their families. Itzhak Bezalel was an accountant, and Shmuel Bezalel was an economist. Both resided in Israel and held full-time jobs unconnected with DMC in 1979 and thereafter. A third brother, Benzion Bezalel, served as a consultant to DMC on the management of the research and development projects.

Benzion Bezalel was an industrial and management engineer and was experienced in the management of research and development projects in Israel. When Mr. Wyslotsky met him in 1977, Benzion Bezalel was employed in Chicago as the Israeli Consul of Economic Affairs for the midwest region of the United States. Mr. Wyslotsky initially attempted to persuade Benzion Bezalel to work for TEC Packaging; but when Mr. Bezalel made salary and stock ownership demands that Mr. Wyslotsky thought excessive, they agreed that Mr. Bezalel would assist TEC in Israel through an Israeli corporation, DMC, to be owned by Mr. Bezalel's brothers.

The principals of TEC and DMC never intended for DMC to actually perform any development work. Instead, DMC's role in these, and in all the other Israeli research and development investments promoted by TEC, was to assist TEC in negotiating and administering research and development subcontracts with Israeli engineering firms, to disburse the partnerships' development funds to TEC Packaging and Israeli subcontractors, and, in Benzion Bezalel's words, "to manage [the] tax operation in Israel."

It cannot be definitely ascertained from the record how the partnerships' capital was expended. According to the records of DMC, through September 1981, it received

development fees (which did not include any periodic payments) and made disbursements to itself, to Israeli subcontractors, and to TEC Packaging as follows:

| | DISPOARD Bacon board dispenser | LABLESS Labeler | Thermoformer |
|---|---|---|---|
| Received | $228,002.09 | $251,926.37 | $289,915.26 |
| DMC | 14,560.00 | 15,890.00 | 18,550.00 |
| To Israeli subcontractors | 31,231.88 | 20,072.62 | 121,500.00 |
| To TEC Packaging | 181,001.65 | 214,291.52 | 134,621.19 |
| Unexpended in September 1981 | 1,208.56 | 1,672.23 | 15,244.07 |

Most of the money paid to TEC Packaging by DMC, pursuant to the consulting agreements, was then paid over to TEC. TEC spent the money in the United States on the direct development costs (materials, labor, factory overhead) that it incurred in connection with each system and on a portion of its general and administrative expenses that it allocated to each system. No written contract existed between TEC Packaging and TEC; TEC merely billed TEC Packaging as it incurred expenses relating to the systems.

TEC completed development of the labeler by July 15, 1981, and the thermoformer by July 31, 1982. However, the bacon board dispenser was never completed because TEC ran short of funds in 1981 and 1982. Since it had advance orders from customers for the dieless system, labeler, and thermoformer, TEC gave the development of those projects top priority.

TEC controlled the marketing of the labeler and the thermoformer. It marketed the products as part of the larger, integrated TEC packaging machinery system and under the "TEC" tradename. There is no evidence that Ms. Ben-Gershon, as general partner of the partnerships, was ever, in any way, involved in the marketing of the systems or in establishing their sales prices or the terms of their sale.

TEC eventually sold two labelers at $30,000 each and three thermoformers at $40,000 or $45,000 each. After the sale of the first labeler, in October 1982, TEC paid a total of $9,600 to Labless. The $9,600 represented the balance of the $30,000 sales price remaining after subtraction of the 53-percent manufacturing fee ($15,900) and 15-percent mar-

keting fee ($4,500) due TEC Packaging. TEC transferred $4,800 of the $9,600 to Labless' Israeli bank account for distribution to DMC as a periodic payment of IS141,616.08, pursuant to the labeler development agreement. However, for some unknown reason, only $4,697.15 was transferred to DMC. In accordance with the labeler consulting agreement, DMC paid the entire $4,697.15 periodic payment to TEC Packaging. TEC transferred the second half of the $9,600 to Mr. Shefsky's law firm, which then distributed $4,752 to Labless' limited partners and directed Ms. Ben-Gershon to withdraw $48 (apparently from Labless' Israeli bank account) as her 1-percent distribution. Mr. Levin received a distribution of $83.54.

TEC made no payments to, or on behalf of Labless, in connection with its sales of the second labeler and the three thermoformers. In May 1983, Allstate Insurance Co. (Allstate) and Hambro America, Inc. (Hambro), which in 1981 had invested $2 million in TEC, obtained a controlling interest in the company in return for their agreement to invest more money. As part of the agreement, Messrs. Wyslotsky and Shefsky resigned as officers and directors of TEC and its affiliated companies. A new chief executive officer was installed at TEC, and he, after consultation with Allstate and Hambro, decided that after the first labeler payment, TEC would make no further payments to Labless with respect to later sales of the labeler and thermoformer because TEC had lost money on the sales due to equipment failures that it had had to correct at its own expense. There is no evidence that Ms. Ben-Gershon or any of Labless' limited partners ever inquired about, or pursued any legal action with respect to, the payments to which Labless was entitled.

As a part of the agreement whereby Allstate and Hambro gained control of TEC, TEC assigned all of its rights and those of its subsidiaries (TEC Packaging and TEC Equipment) under the manufacturing, marketing, and consulting agreements for the bacon board dispenser and the thermoformer to a newly formed corporation owned by Mr. Wyslotsky. Dispoard and Labless were not involved in the negotiation of the assignments; as a part of the agreements to assign the contracts to his new firm, Mr. Wyslotsky

agreed to secure the partnerships' approval. No assignment of the labeler contracts was made in 1983, although Mr. Wyslotsky and TEC were discussing such an assignment at the time of trial.

Allstate invested additional money in TEC in 1983 after Allstate and Hambro gained control of the company. Eventually, they sold TEC to an established company.

Ms. Ben-Gershon's activities on behalf of Dispoard and Labless were not substantial. She executed all of the development, manufacturing, and marketing agreements on behalf of the partnerships, but she did not negotiate their terms. She maintained bank accounts in Israel for each of the partnerships. She paid bills submitted by TEC's Israeli lawyers and accountants for their services in connection with the partnerships (although Mr. Wyslotsky determined how the legal expenses were to be allocated among the several partnerships for which they were performed). According to Benzion Bezalel, Ms. Ben-Gershon "showed a lot of interest" in the development of the systems. Because she was interested in learning about the meat packaging industry, in 1979, Mr. Wyslotsky assisted her in obtaining trade magazines and technical articles and accompanied her on a tour of a meat packing house in Israel. On one occasion, she went with Mr. Wyslotsky when a subcontract with an Israeli engineering firm was negotiated.

The liabilities of Dispoard and Labless for the development fees payable as periodic payments in Israeli pounds (subsequently shekels) were not indexed for inflation (i.e., linked to changes in the Israeli consumer price index) or linked to the exchange rate of any foreign currency, including the U.S. dollar. The chart below sets forth the inflation rate (December to December and rounded to the nearest full percent) in Israel in 1960 through 1978:

| Year | Inflation rate | Year | Inflation rate |
|---|---|---|---|
| 1960 | 3% | 1970 | 10% |
| 1961 | 9 | 1971 | 13 |
| 1962 | 10 | 1972 | 12 |
| 1963 | 5 | 1973 | 26 |
| 1964 | 4 | 1974 | 56 |
| 1965 | 7 | 1975 | 24 |
| 1966 | 8 | 1976 | 38 |
| 1967 | 0 | 1977 | 42 |
| 1968 | 2 | 1978 | 48 |
| 1969 | 4 | | |

By the last quarter of 1978, inflation was at an annualized rate of 82 percent.

In 1979, the rate dropped in the first quarter, but then accelerated throughout the remainder of the year:

|  | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|
| Inflation rate (annualized) | 66% | 93% | 133% | 168% |

The overall inflation rate was 111.3 percent in 1979 (December 1978 to November 1979). On December 30, 1979, the Governor of the Bank of Israel (Israel's central bank) stated publicly that inflation in 1980 was not likely to drop below 100 percent.[10] In March 1979, the Government of Israel had made the slowing of the pace of inflation the immediate target of its economic policies for 1979; in the past, the Government had had some success in bringing inflation under control, such as in the years 1967 through 1969 and 1975.

The linkage of financial instruments—to the consumer price index or to a foreign currency—has a long history in Israel. Since the 1930s, the wages of most Israeli workers have been at least partially indexed for inflation, even during periods when inflation rates were not high. Israeli Government bonds have been fully or partially indexed or linked since 1948. By 1979, virtually all credit affecting consumers, such as medium (2 to 3 years) and long-term (4 to 15 years) savings plans and mortgages, was linked either to the consumer price index or to a foreign currency. However, in 1979, the linkage of commercial credit was not so pervasive. The Government of Israel extended the majority of credit in Israel, and private sector lenders, such as banks, made short-term loans almost exclusively. Most of such private sector credit was unlinked because, under Israeli law, it was illegal to link a loan to the consumer price index or to the exchange rate if the debt was likely to be repaid in less than 24 months. The interest rate on linked bank credit did not exceed 7.5 percent. The following

---

[10]As it turned out, the inflation rate in 1980 was 132.9 percent.

chart shows the distribution of unlinked bank credit by interest rate in 1979:

| Stated interest rate | Percent of outstanding credit |
|---|---|
| [11]Up to 40 | 9.4 |
| 44-48 | 0.5 |
| 48-52 | 1.0 |
| 52-56 | 0.7 |
| 56-60 | 2.8 |
| 60-64 | 0.5 |
| 64-68 | 8.3 |
| 68-72 | 4.4 |
| Above 72 | 72.4 |
| Total | 100.0 |

Interest rates on short-term unlinked debt increased throughout 1979, as exemplified by the rise in interest rates on bank overdraft accounts (a common way of receiving short-term credit):

1979

| First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|
| 63% | 69% | 93% | 132% |

Market interest rates for unlinked long-term loans in 1979 are unavailable because the Government extended most of such credit at subsidized rates. Prior to May 29, 1979, Government commercial loans were not linked. From January to May 1979, such loans (with the exception of loans made by the Office of Chief Scientist of the Ministry of Industry, Commerce and Tourism) bore interest of 22 to 32 percent, depending on the nature of the enterprise and the location in the country where the money was to be spent. On May 29, 1979, the Government changed its loan policy in view of the high level of inflation and the uncertainty with regard to the future pace of inflation. All long-term loans (except Chief Scientist loans) applied for after May 29, 1979, were fully linked either to the consumer price index or to the U.S. dollar. If linked to the consumer price index, the loan had an interest rate of from 0.5 to 1.5 percent; if linked to the dollar, the loan had an interest rate of from 6.0 to 7.5 percent.

---

[11]The exhibit from which this chart is taken reads "up to 40"; it should probably read "up to 44."

The terms of the partnerships' periodic payments liabilities under the development agreements were modeled on the terms of loans made by the Office of Chief Scientist. The Chief Scientist made subsidized long-term loans for research and development to encourage foreign investment in research and manufacturing in Israel. To qualify for the loan, the foreign investor, as a partner in an Israeli partnership, had to match the amount of the pound (later, shekel) loan with an equivalent amount in U.S. dollars, at current exchange rates. The loan principal matured in 12 years, was not linked, and bore interest of 5 or 6 percent in 1979.[12] If the project was successfully developed prior to the maturity date, 25 percent of the "net profit" (a defined term) was payable to the Government in reduction of the principal and interest on the loan.

Under the income tax laws of Israel in 1979, accrual method creditors, but not cash method creditors, were required to recognize "linkage differentials" as currently taxable income; that is, the law required that *linked* financial assets (and liabilities) be adjusted periodically to current values, making linkage differentials an item of taxable income (or expense) for the period.

In October 1977, the Israeli Government implemented a "New Economic Policy." Two elements of this policy were (1) a devaluation of the Israeli pound from 10 pounds to $1 U.S. to 15 pounds to $1, and (2) a liberalization of foreign exchange rates by allowing the value of the Israeli currency to float freely as against other currencies. The latter policy suggested that, in the long run, the pound (shekel)-dollar exchange rate would rise by approximately the relative inflation in Israel as compared to the inflation in the United States.[13] Factors other than the relative rate of inflation also affect exchange rates, and in subsequent years, the foreign exchange market was not perfectly free because the

---

[12] Since 1982, loans made by the Office of Chief Scientist have been linked.

[13] For example, if the inflation rate was 111 percent in Israel and 10 percent in the United States, then the exchange rate of the Israeli pound versus the dollar should rise by about 92 percent, calculated as follows:

$$\text{Devaluation rate} = \frac{1 + \text{inflation rate in Israel}}{1 + \text{inflation rate in U.S.}} - 1$$

in our example,

$$91.8\% = \frac{1 + 1.11}{1 + .1} - 1$$

Israeli Government implemented new controls on foreign exchange dealings. However, there was some concurrence between the rate of Israeli inflation and the rate of Israeli currency depreciation against the dollar in the years following the implementation of the liberalized exchange policy:[14]

| Year | Inflation rate | Currency depreciation rate |
|---|---|---|
| 1977 | 42% | 76% |
| 1978 | 48 | 24 |
| 1979 | 111 | 86 |
| 1980 | 133 | 118. |
| 1981 | 101 | 106 |
| 1982 | 131 | 115 |
| 1983 | 191 | 220 |

On December 19, 1979, the exchange rate was 33.83 pounds to $1 U.S. (or 3.38 shekels to $1). On December 31, 1979, the exchange rate was 34.02 pounds to $1 (or 3.40 shekels to $1). By May 2, 1984, the most recent date for which an exchange rate is available in the record, the exchange rate had risen to approximately 175 shekels to $1. Thus, during the period from December 1979 to May 1984, the Israeli currency was devalued against the dollar by about 5,200 percent.[15]

The private placement memorandums of Dispoard and Labless referred to the effect of the continuous devaluation of the Israeli pound on the liability for periodic payments several times. For example, the section of the memorandums that dealt with the tax consequences of an investment in the partnerships stated, in part:

(i) * * * Therefore, their [the limited partners'] basis should be equal to the amount of their cash contributed to the Venture plus their share of the Venture's liabilities resulting from the Development Agreement for which they are personally liable. However, in the event the Israeli Pound continues to decline in value with respect to the U.S. dollar, the amount of this obligation at the end of each subsequent year, converted into U.S. dollars, may also decline. Although such decline should not affect the Limited Partners' basis, since the Venture anticipates accounting for all items at their historical costs, the Service may treat such a decline in

---

[14]All figures are rounded to the nearest full percent.

[15]The rate of currency depreciation for any period is calculated in the following manner:

$$\frac{\text{Beginning Exchange Rate} - \text{Ending Exchange Rate}}{\text{Beginning Exchange Rate}} = \frac{\text{Percentage}}{\text{Depreciation}}$$

obligation as a distribution of cash from the Venture thereby resulting in taxable income to the Limited Partners.

(j) Although the Venture has an unconditional obligation to pay the entire contractual obligation, in the event the product being developed on its behalf is not successfully developed, manufactured and marketed, the date of such required repayment is considerably in the future, subject to reduction, in terms of United States dollars, in the event the Israeli Pound decreases in value with respect to the dollar. Due to the substantial likelihood that the amount of such obligation stated in terms of U.S. dollars may be substantially reduced through such devaluation, the Internal Revenue Service may contend that the Limited Partners are not "at risk" with respect to all or a portion of his [sic] contractual obligation for which they are personally liable.

The 1979 Federal tax returns of Dispoard and Labless were filed on a calendar year basis and were prepared by use of the accrual method of accounting. Dispoard reported an ordinary loss of $472,782, which consisted of the following claimed expenses (the partnership reported no income):

| | |
|---|---|
| Direct developmental expenses | $459,262 |
| Financial advisory fees | 11,242 |
| Partnership fees | 1,465 |
| Miscellaneous | 79 |
| Interest and exchange rate differences | 734 |
| Total | 472,782 |

The development expense of $459,262 consisted of cash payments made in 1979 ($117,613) plus the dollar value of Dispoard's I£11,558,000 first stage periodic payments liability to DMC at the December 19, 1979, exchange rate of 33.83 pounds to the dollar ($341,649). Of the $117,613 of cash deducted as a development expense, $20,000 was eventually remitted to TEC, and from TEC to the law firm of Shefsky, Saitlin & Froelich as a legal fee. Such fee consisted of syndication fees of $10,000 and organizational expenses, as defined in section 709(b)(2), of $10,000.

On its return for 1979, Labless reported an ordinary loss of $963,538, which was calculated as follows:

| | |
|---|---|
| Interest income | $258 |
| Expenses: | |
| Direct developmental | 947,517 |
| Accounting and advisory | 13,941 |
| Interest | 2,338 |
| Total expenses | 963,796 |
| Ordinary loss | (963,538) |

The parties have stipulated that the developmental expense of $947,517 consisted of cash payments ($227,352) plus the dollar value of three Israeli pound liabilities, totaling I£24,500,000, assigned to Labless by Achad, Shtayim, and Shalosh, at the December 31, 1979, exchange rate of 34.02 pounds to the dollar ($720,165).[16] Of the cash payments deducted as a developmental expense, $50,000 was eventually remitted to Shefsky, Saitlin & Froelich as a legal fee. Such fee consisted of syndication fees of $25,000 and organizational expenses, as defined in section 709(b)(2), of $25,000.

Achad, Shtayim, and Shalosh filed partnership returns for 1979, using the accrual method of accounting. Each partnership reported an ordinary loss for the year, which consisted of the partnership's distributive share of Labless' loss and certain additional deductions (each partnership had no income), as follows:

|  | Achad | Shtayim | Shalosh |
|---|---|---|---|
| Distributive share of Labless' loss | $356,509 | $308,332 | $298,697 |
| Partnership fees | 1,165 | 1,014 | 970 |
| Miscellaneous | 27 | 24 | 23 |
| Inland travel expense | - - - | 6 | - - - |
| Total | 357,701 | 309,376 | 299,690 |

On their Federal income tax returns for 1979, Mr. Hrabosky claimed a loss deduction of $101,567 attributable to the operation of Dispoard, and Mr. Levin claimed a loss deduction of $37,916 attributable to the operations of Labless and Achad. In his notices of deficiency, the Commissioner has disallowed such deductions in full.

### OPINION

The only issues for decision are whether the partnerships, Dispoard and Labless, are entitled to the deductions claimed by them for research and experimental expenses and for interest expenses. The petitioners have made no argument with respect to the other deductions claimed by Dispoard, Labless, and Achad and, therefore, are deemed to

---

[16]It is not clear from the record what amounts were included in the Labless limited partnerships' liabilities, totaling I£24,500,000. Under the labeler and thermoformer development agreements, Labless owed DMC first stage periodic payments totaling only I£24,204,000. See text p. 708 *supra*.

have conceded their nondeductibility. Rule 142(a), Tax Court Rules of Practice and Procedure. Furthermore, they have advanced no argument with respect to those amounts deducted by Dispoard and Labless as development expenses but which actually consisted of syndication fees and organizational expenses. It is settled that syndication fees are not deductible, either as expenses or through amortization (sec. 709(a); *Estate of Thomas v. Commissioner*, 84 T.C. 412 (1985)), and any payments by the partnerships for organizational expenses must be capitalized and, if elected, amortized in accordance with section 709(b). Since the partnerships have made no such election, the payments for organizational expenses are not amortizable. *Landry v. Commissioner*, 86 T.C. 1284 (1986).

Section 174(a)(1) provides, as a general rule, that a taxpayer may elect to "treat research or experimental expenditures which are paid or incurred by him during the taxable year in connection with his trade or business as expenses which are not chargeable to capital account." Expenditures so treated are deductible in the taxable year in which paid or incurred. Section 1.174-2(a)(2) of the regulations states that the provisions of section 174(a)(1) "apply not only to costs paid or incurred by the taxpayer for research or experimentation undertaken directly by him but also to expenditures paid or incurred for research or experimentation carried on in his behalf by another person or organization (such as a research institute, foundation, engineering company, or similar contractor)."

The Commissioner maintains that Dispoard and Labless are not entitled to deductions for research and experimental expenses because (among other reasons[17]) they did not pay or incur such expenses "in connection with" any trade or business within the meaning of section 174. He contends that the partnerships were precluded by contractual arrangements and by design from ever actively engaging in trades or businesses. The petitioners acknowledge that

---

[17]The other grounds asserted by the Commissioner on brief for disallowing all or a part of the claimed research and experimental deductions (or the losses arising therefrom) are (1) that the research or experimentation was not carried on "in * * * [the partnerships'] behalf" within the meaning of sec. 1.174-2(a)(2), Income Tax Regs., (2) that the petitioners were not "at risk" within the meaning of sec. 465 for the development fees denominated as periodic payments, and (3) that the partnerships were activities "not engaged in for profit" within the meaning of sec. 183.

Dispoard and Labless were not "carrying on" trades or businesses in 1979, but they maintain that the partnerships were conducting research and development activities "in connection with" businesses which would or might be carried on in the future.

In *Snow v. Commissioner*, 416 U.S. 500 (1974), revg. 482 F.2d 1029 (6th Cir. 1973), affg. 58 T.C. 585 (1972), the Supreme Court held that use of the phrase "in connection with * * * [a taxpayer's] trade or business" in section 174 was intended to dilute some of the conceptions of "ordinary and necessary" business expenses that had been suggested for section 162(a) and for other sections of the Code. Specifically, the Court disclaimed application to section 174 of the test advanced by Justice Frankfurter in a concurring opinion in *Deputy v. du Pont*, 308 U.S. 488, 499 (1940), wherein he maintained that carrying on any trade or business (for purposes of the predecessor of section 162) "involves holding one's self out to others as engaged in the selling of goods or services." The Court concluded in *Snow* that a trade or business test under section 174 which depended on the existence of production or sales of the invention "would defeat the congressional purpose somewhat to equalize the tax benefits of the ongoing companies and those that are upcoming and about to reach the market." 416 U.S. at 504. In so concluding, the Court overturned the lower courts in *Snow* and overruled earlier cases, which had held that research expenditures by a taxpayer not currently engaged in a trade or business were nondeductible, pre-operating expenses. See, e.g., *Snow v. Commissioner*, 58 T.C. at 594-596, affd. 482 F.2d at 1029, 1032, revd. 416 U.S. at 500; *Koons v. Commissioner*, 35 T.C. 1092 (1961).

Although *Snow* established that a taxpayer need not be currently carrying on a trade or business to obtain a deduction for research expenses,

it did not eliminate the "trade or business" requirement of section 174 altogether. For section 174 to apply, the taxpayer must still be engaged in a trade or business *at some time*, and we must still determine, through an examination of the facts of each case, whether the taxpayer's activities in connection with a product are sufficiently substantial and regular to constitute a trade or business for purposes of such

section. * * * [*Green v. Commissioner*, 83 T.C. 667, 686-687 (1984). Emphasis in original; fn. ref. omitted.][18]

In *Green v. Commissioner, supra,* we held that a limited partnership, LaSala, that financed the research and development of four inventions but retained no control over the manufacturing or marketing of such inventions was not conducting research "in connection with" a trade or business for purposes of section 174. LaSala was organized to acquire and to invest in the development of the four inventions alone, in return for a royalty interest in the revenues derived from their commercial exploitation. Immediately after acquiring the inventions, LaSala contracted with NPDC, an unrelated party, to develop the inventions, and it granted NPDC the exclusive, worldwide right to manufacture, use, and sell the developed inventions for their patentable lives. After entering into such agreements with NPDC, LaSala was incapable of carrying on a trade or business with respect to the inventions; its activities could be, and were, purely ministerial. We concluded that LaSala "functioned only as a vehicle for injecting risk capital into the development and commercialization of the four inventions. Its activities never surpassed those of an investor. It was not the up-and-coming *business* which section 174 is intended to promote." 83 T.C. at 687; emphasis in original.

We need not, and do not, decide whether Mr. Wyslotsky, TEC, or any of the persons (other than the partnerships) involved in the transactions described herein was engaged in research or experimentation within the meaning of section 174; we must decide only whether the partnerships were engaged, at any time, in a trade or business in connection with which funds were expended for research and experimentation within the meaning of section 174. A careful review of the contracts executed by Dispoard and Labless and the actual activities of the partnerships convinces us that, like the limited partnership in *Green*, they neither intended nor were capable of ever engaging in trades or businesses. By design, each partnership's role was

---

[18]See also *Spellman v. Commissioner*, T.C. Memo. 1986-403; *Hoerrner v. Commissioner*, T.C. Memo. 1985-347; *Shaller v. Commissioner*, T.C. Memo. 1984-584, on appeal (4th Cir., June 25, 1985); *Lahr v. Commissioner*, T.C. Memo. 1984-472, affd. sub nom. *Independent Electric Supply, Inc. v. Commissioner*, 781 F.2d 724 (9th Cir. 1986); *Kilroy v. Commissioner*, T.C. Memo. 1980-489.

restricted to that of a passive investor. TEC needed funds to develop the new packaging machinery, or "systems," that it wished to add to its product line. Through the "off-balance-sheet" financing technique suggested by Mr. Shefsky, TEC's co-owner and an attorney-accountant, TEC obtained such financing, yet insured that it retained effective control over the development, manufacture, use, and marketing of the machinery for its probable commercial life.

Dispoard and Labless were organized in December 1979. In that same month, they entered into the development, manufacturing, and marketing agreements. All of the agreements were effective immediately. Under the development agreements, the partnerships disbursed virtually all of their capital to DMC to pay for the development of the packaging systems by TEC, TEC Packaging, and Israeli subcontractors. The partnerships had no power under the development agreements to direct the research and development, and although their general partner, Ms. Ben-Gershon, once accompanied Mr. Wyslotsky when a contract with an Israeli subcontractor was negotiated, the record reveals that Mr. Wyslotsky and TEC controlled the research and the disposition of the development funds. Under the manufacturing and marketing agreements, the partnerships granted TEC Packaging the exclusive right to manufacture, use, and market the packaging systems. The terms of both agreements exceeded the patentable lives of the systems: the manufacturing agreements were effective for 48 years, and the marketing agreements were effective for 29 years. In *Green v. Commissioner, supra*, we held that a similar grant, for consideration, of the exclusive right to manufacture, use, and sell an invention for the duration of the patent term constitutes a sale of the grantor's substantial rights in the invention. 83 T.C. at 679-680; see also *Waterman v. Mackenzie*, 138 U.S. 252 (1891); *Merck & Co. v. Smith*, 261 F.2d 162 (3d Cir. 1958); *Massey v. United States*, 226 F.2d 724 (7th Cir. 1955); *Watson v. United States*, 222 F.2d 689 (10th Cir. 1955). However, we need not decide in the present case whether the combined result of the manufacturing and marketing agreements was to effect sales of the packaging machinery inventions because, even if the agreements granted only licenses, they deprived the partnerships of

control over the manufacture, use, and sale of the developed machines for virtually the entire lives of the partnerships—the partnerships are to terminate in the year 2009.

Like the partnership in *Green*, Dispoard and Labless engaged in purely ministerial activities after executing the development, manufacturing, and marketing agreements. They maintained bank accounts, paid development, legal, and accounting fees, and filed tax returns. Labless also distributed the royalty payment received from the sale of one labeler. However, contrary to the petitioners' assertions on brief, there is no evidence that the partnerships, through Ms. Ben-Gershon, in any way actually directed the development or marketing of the packaging systems. For example, the petitioners claim that when Allstate gained control of TEC in 1983, the partnerships "negotiated a termination of TEC's involvement in the research and development, demanding and obtaining from DMC a reassignment of the subcontracted matters to other companies with which Mr. Wyslotsky had become affiliated." In fact, the assignments from TEC to Mr. Wyslotsky's new corporation were a part of the agreement whereby Allstate and Hambro took control of TEC and forced Mr. Wyslotsky to resign from the corporation. As a part of the deal, Mr. Wyslotsky's new firm was assigned all rights to the manufacturing, marketing, and development contracts for the bacon board dispenser and the thermoformer (but not the labeler). There is absolutely no evidence that the partnerships, Ms. Ben-Gershon, or DMC in any way initiated or negotiated such assignments. For the same reason, the petitioners' contention that the partnerships caused the manufacturing agreements to be assigned to Mr. Wyslotsky's new firm pursuant to the agreements' provision for replacement of TEC Packaging if it became uneconomic for it to produce the machinery is unfounded. Finally, there is no evidence that the partnerships took part in setting the prices and terms of sale of the machinery, or were ever called upon to finance the manufacturing costs of machines which were sold before final payment was received from a customer. Interestingly, despite the petitioners' strained attempts to portray business-like activities of the partnerships, they offered no substantial explanation for Labless' lateness in pursuing the

money to which it was entitled from TEC's sales of the second labeler and the three thermoformers: the petitioners assert that legal action would have been fruitless because TEC, by that time, was insolvent, but TEC's insolvency has not been proven, and in 1983, Allstate invested more money in TEC and, eventually, sold TEC to an established company.

In short, we are thoroughly persuaded that when Dispoard and Labless were organized in 1979, they never intended to engage in trades or businesses at any time in the future, and this conclusion is supported by the limited nature of their activities in the years following. The role of the partnerships was similar to that of a shareholder who contributes money to a corporation. Even though the corporation may engage in research or experimentation in connection with its trade or business, the shareholder is not in the trade or business and is not entitled to a deduction under section 174. See *Deputy v. du Pont, supra.* The partnerships, like the shareholders, were mere investors. Therefore, because they did not incur research and experimental expenses "in connection with" trades or businesses, Dispoard and Labless are not entitled to deductions for such expenses in 1979. We are merely holding that the claimed expenses are not deductible under section 174; we do not have before us the issue of what are the other tax consequences of any amounts actually spent by the partnerships for research and experimentation.

The second issue for decision is whether Dispoard and Labless are entitled to deductions for the accrued interest on their first-stage periodic payments obligations to DMC. The Commissioner maintains that the partnerships' liabilities for the periodic payments were not genuine debts because they lacked economic substance. The petitioners maintain that the liabilities did constitute genuine, recourse debts and that the terms of such liabilities were dictated by business considerations.

Section 163(a) allows a deduction for "all interest paid or accrued within the taxable year on indebtedness." However, it is well established that section 163(a) does not permit the deduction of interest arising from loan arrangements that serve no "purpose, substance, or utility apart from their anticipated tax consequences." *Goldstein v. Commissioner,*

364 F.2d 734 (2d Cir. 1966), affg. 44 T.C. 284 (1965); see *Knetsch v. United States*, 364 U.S. 361 (1960); *Tolwinsky v. Commissioner*, 86 T.C. 929 (1986); *Julien v. Commissioner*, 82 T.C. 492 (1984); *Karme v. Commissioner*, 73 T.C. 1163 (1980), affd. 673 F.2d 1062 (9th Cir. 1982). In the present case, the interest deductions arise from the partnerships' deferred liabilities for development fees, which were incurred on December 19, 1979. These recourse deferred liabilities, or periodic payments, were stated in Israeli pounds, bore interest at the rate of 10 percent per annum in 1979, 1980, and 1981, and 8 percent thereafter, and were payable (with the accrued interest thereon) 50 percent by January 31, 1994, and 50 percent by January 15, 1995, unless sooner paid from revenues generated by sales of the systems. For the reasons set forth hereafter, we conclude that the periodic payments liabilities served no purpose beyond generating tax deductions under sections 174 and 163.

At the outset, we observe that the question of the proper tax accounting treatment of a genuine debt stated in a foreign currency, such as the Israeli pound (or shekel),[19] is distinct from the question of whether the obligation itself is a genuine debt. Only if the debt is found to be genuine does the question of its proper accounting treatment arise.

We have gleaned a number of facts regarding Israeli capital markets, inflation rates, and currency exchange rates from the experts' reports and testimony presented by both parties. These facts (set forth more fully in our findings of facts) establish that, other than the Office of Chief Scientist of Israel's Ministry of Industry, Commerce and Tourism, Israeli creditors, including the Government, did not extend credit in December 1979 on the terms granted to Dispoard and Labless under the development agreement. Private sector lenders made short-term loans almost exclusively. Such loans were not linked because

---

[19]It appears to be the rule that an obligation stated in a foreign currency is reported for Federal tax purposes in U.S. dollars at the rate of exchange in effect on the date incurred. If, because of a subsequent decline in the value of the foreign currency, the debt is satisfied at a lower dollar cost than originally reported, the taxpayer recognizes a gain at that time from a separate transaction—the speculation in foreign currency. *Willard Helburn, Inc. v. Commissioner*, 214 F.2d 815 (1st Cir. 1954), affg. 20 T.C. 740 (1953); *America-Southeast Asia Co. v. Commissioner*, 26 T.C. 198 (1956); Rev. Rul. 75-106, 1975-1 C.B. 31; R. Rhoades & M. Langer, 2 Income Taxation of Foreign Related Transactions 6-24 to 6-25 (1985); see also *National-Standard Co. v. Commissioner*, 80 T.C. 551 (1983), affd. 749 F.2d 369 (6th Cir. 1984).

Israeli law forbade the linkage of short-term (less than 24 months) debt, but such debt bore much higher rates of interest than loans linked to either the Israeli consumer price index or a foreign currency, such as the dollar. In 1979, over 72 percent of the unlinked credit extended by Israeli banks bore interest at rates exceeding 72 percent. Most long-term credit (over 24 months) was extended by the Israeli Government and at subsidized interest rates. By June 1979, all new long-term loans made by the Government, except Chief Scientist loans, were fully linked either to the consumer price index or to the dollar, and such loans bore interest ranging from 0.5 to 1.5 percent if linked to the consumer price index or from 6.0 to 7.5 percent if linked to the dollar. Prior to June 1979, the Government loans were not fully linked but bore higher rates of interest (22 to 32 percent). The Government began linking its loans because of Israel's high rate of inflation in 1979 and the continuing uncertainty regarding future rates of inflation.

Only the Chief Scientist made loans on terms like those extended to the partnerships by DMC. The petitioners contend that because the Chief Scientist's loans were most like the partnerships' periodic payments liabilities, they are the "best comparables" and support the conclusion that the terms of the partnerships' liabilities were not unusual in the context of Israeli research and development projects and, therefore, were "justified by the commercial customs of the time and place." But this argument merely begs the question, which is "would a business person have extended credit in Israel in December 1979 on such terms?" That the Israeli Government extended such credit through its dollar "matching" loans from the Chief Scientist was attributable to its desire to attract foreign exchange and foreign investment in research and development in Israel. Those objectives are public, not business, concerns. That private sector creditors and the Government, when it made long-term loans to Israelis, did not extend credit on such terms reveals that the partnerships' liabilities were unique.

The petitioners advance two business reasons that allegedly motivated the use of unlinked debt. First, they maintain that if the devaluation of the pound continued, an unlinked debt gave DMC and TEC Packaging an incentive to

complete development of the systems quickly: the longer development took, the fewer dollars would be received by them as periodic payments under the development and consulting agreements. Initially, we observe that this purpose cannot have substantially motivated the use of unlinked debt if, as the petitioners also allege, the parties to the contracts did not expect the value of the pound to continue falling after 1979. But more importantly, any incentive for prompt completion furnished by unlinked debt was superfluous. Under the consulting agreements, DMC was to pay 95 percent of the periodic payments to TEC Packaging, which, through Mr. Wyslotsky and TEC, would actually control the development of the systems. TEC Packaging had an independent incentive to complete quickly development of the systems in the manufacturing and marketing fees that it would receive. In fact, its marketing fees were to increase when it reached each system's "marketing achievement level."[20] The marketing achievement levels were roughly equivalent to the sales needed to extinguish the periodic payments liabilities. Of course, even with its increased marketing fee percentage, TEC Packaging's overall percentage interest in the systems' gross revenues would decline due to the termination of the periodic payments,[21] but its receipts in absolute dollars would always rise as sales rose. Thus, TEC Packaging and TEC had an incentive to develop the systems as expeditiously as possible, regardless of the nonlinkage of the periodic payments.

The petitioners also contend that Israeli income tax laws compelled, or at least supported, the use of nonlinked debt. They maintain that DMC insisted on unlinked debt because, as an accrual method taxpayer, it would have had to recognize each year as income the yearly increase in the

---

[20]Upon achievement of the marketing achievement levels, TEC Packaging's marketing fee percentage was to increase to 27 percent for the bacon board dispenser and the labeler and to 25 percent for the thermoformer.

[21]Prior to reaching the marketing achievement levels, TEC Packaging's total percentage interest in the gross revenues of the systems (via its 95-percent share of the periodic payments percentage, its manufacturing fee percentage, and its marketing fee percentage) was 78.95 percent for the bacon board dispenser, 83.20 percent for the labeler, and 84.25 percent for the thermoformer. After it reached the marketing achievement levels and the partnerships' periodic payments liabilities were satisfied, TEC Packaging's total percentage interest in the gross revenues was 71 percent for the bacon board dispenser and 80 percent for the labeler and the thermoformer.

value of the debts created by a linkage arrangement. Conceivably, if few or no periodic payments were made until the entire balance of the debts became due in 1995 (because sales were minimal or nonexistent), then DMC actually could be better off economically if the debts were unlinked: it would not have to pay income tax in the interim on the linkage differentials. The Commissioner argues that there is no proof that DMC was required to adopt the accrual method of accounting, but in any event, the petitioners' argument overlooks the fact that DMC apparently could have accrued an offsetting tax deduction for 95 percent of the linkage differentials because it was obligated to pay TEC Packaging 95 percent of the periodic payments. TEC Packaging used the cash method of accounting and, therefore, would not have had to recognize currently the linkage income. The petitioners' argument disregards the fact that if the systems were quickly and successfully marketed, linked debts would have provided a greater return to DMC and TEC Packaging, even though taxes were payable on linkage income. Since TEC Packaging was to receive almost all of the periodic payments and since it used the cash method, there is no apparent reason why such liabilities were unlinked unless it was intended that the partnerships never pay the dollar values originally ascribed to them.

On this record, we are altogether convinced that the periodic payments liabilities were incurred solely for the tax benefits that they were expected to generate. They furnished the leverage needed to create a "tax shelter" for the investors in these research and development projects. According to Mr. Wyslotsky, TEC expected that the cash invested by Dispoard and Labless would be sufficient to cover the projected development costs of the systems, including a small margin for cost overruns; the periodic payments were to be the "profit" on the development. It is striking that the partnerships would agree to pay development stage "profits" of almost three times the expected development costs if they truly believed that the profits would not decline due to devaluation of the Israeli currency. In fact, the private placement memorandums of Dispoard and Labless reveal that the promoters expected continuing and substantial currency devaluation, which would substan-

tially reduce (if not almost eliminate) the dollar amounts that the partnerships and the limited partners might have to pay when the debts came due 14 years later. The petitioners' own expert witness testified that, in mid-1979, one could have expected the Israeli inflation rate to be as high as 40 percent per year over the intervening period. Although we think his estimate conservative, if one assumes that the inflation rates are reflected in an equivalent decline in the value of a currency (which actually occurred), then for every $1,000 deducted in 1979 as a development fee expense, the partnerships would have to pay only $8.99 in 14 years.[22] If the rate of currency devaluation was greater than 40 percent, the dollar amounts owed would have been negligible.

The petitioners argue that the tax savings arising from the use of a linked debt actually would have been greater than those derived from the unlinked debt (because the partnerships will have to recognize foreign currency income in 1994 (see note 19 *supra*) and, consequently, tax savings could not have motivated the use of the unlinked debt. This argument ignores the fact that a linked debt would have had economic value to the creditors DMC and TEC Packaging, whereas the unlinked debt had little or none. Moreover, while the unlinked debts might furnish somewhat lower tax benefits than would be derived from linked, recourse debts,

---

[22] If "d" represents the annual rate of Israeli currency depreciation relative to the U.S. dollar, then at the end of "n" years, $1/(1 + d)n$ dollars will be needed to buy 1 Israeli pound. The following formula yields the present value of a $1,000 obligation stated in pounds, if the obligations run from December 1979 to January 1994 and carries a 10-percent interest rate through 1982 and 8 percent thereafter:

$$\text{Present value} = \frac{\$1,000\ [(1.1)^3\ (1.08)^{11}]}{[(1 + d)^{14}\ (1 + i)^{14}]}$$

In this formula, the term $(1 + i)^{14}$ contains "i", the discount rate, which brings future value back to present value. If the interest rate on the obligation (i.e., 10 percent through 1982, 8 percent thereafter), is assumed to be the appropriate discount rate, the interest term in the numerator and the discount rate in the denomination cancel each other, so that the simplified expression

$$\frac{\$1,000}{(1 + d)^{14}}$$

represents the value of the principal of the debt in dollars in 14 years. Assuming an annual currency depreciation rate of 40 percent, $1,000 of Israeli pound debt at 1979 exchange rates could be satisfied with $8.99 in 1994, thus:

$$\frac{\$1,000}{(1 + .40)^{14}} = \frac{\$1,000}{111.12} = 8.99$$

they also would require *substantially* lower out-of-pocket expenditures in 1994 (for income taxes and to satisfy the debts) by the investors. Because of the lower out-of-pocket costs, the overall economic benefit to the investors from this scheme of tax arbitrage was greater using unlinked debt. Thus, tax savings, not business considerations, did form the basis for the inclusion of the periodic payments liabilities in these transactions. Consequently, we hold that Dispoard and Labless are not entitled to the interest deductions that they claimed in 1979.

Because of our resolution of the above issues, we find it unnecessary to consider alternative contentions raised by the Commissioner in his notices of deficiency.

*Decisions will be entered for the respondent.*