SCIENTIFIC MEASUREMENT SYSTEMS I, LTD., MICHAEL H. HOGAN, TAX MATTERS PARTNER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Scientific Measurement Systems I, Ltd. v. Commissioner
Docket No. 8068-89
United States Tax Court
T.C. Memo 1991-69; 1991 Tax Ct. Memo LEXIS 102; 61 T.C.M. (CCH) 1951; T.C.M. (RIA) 91069; February 26, 1991, Filed *102 Decision will be entered for the respondent. Michael H. Hogan, pro se. C. Joseph Craven, for the respondent. WRIGHT, Judge. WRIGHT
MEMORANDUM FINDINGS OF FACT AND OPINION By Notice of Final Partnership Administrative Adjustment (FPAA) dated January 23, 1989, respondent made a $ 1,094,183 adjustment to the Scientific Measurement Systems I, Ltd. (the Partnership), partnership return for taxable year 1982, and a $ 2,983 adjustment to the partnership return for taxable year 1983. The issues for decision are: (1) Whether Scientific Measurement Systems I, Ltd., a Texas limited partnership, is entitled to deduct certain research and experimental expenditures under section 174, [1] and, if so, (2) whether the Partnership's $ 520,125 note payable for research and experimental expenditures represented a fixed obligation entitling the Partnership to a deduction of the full amount of the note in 1982. *103 FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and accompanying exhibits are incorporated herein by this reference. At the time the petition was filed in this case, Michael H. Hogan, the tax matters partner, resided in Austin, Texas. Scientific Measurement Systems I, Ltd., a Texas limited partnership, had its principal place of business in Austin, Texas, and filed its Form 1065, U.S. Partnership Return of Income, for taxable years ending December 31, 1982 and 1983, at the Internal Revenue Service Center in Austin, Texas. Background of Limited Partnership and Research Contractor
The Partnership consisted of nine limited partners and one general partner. The Partnership was formed to finance research and development activities in computerized industrial tomography (CIT) and develop an advanced CIT scanner system of commercial value to various industries. The CIT scanner system would produce a tomogram of the interior of materials such as metal, wood, concrete, plastic, and ceramic. A tomogram is a cross-sectional display of an object's interior that can be used to detect and measure its internal characteristics *104 without touching or damaging it. The CIT scanner is analogous to the "C.A.T. Scanner" used to perform nonsurgical medical examinations. The CIT scanner system would enable manufacturers to determine internal characteristics and location of hidden product flaws in a wide range of materials. Nondestructive tomographic inspection of metal and plastic parts for aircraft and ships, rocket motors, orbital and exploratory satellites, underwater structures, pipes, and castings could be performed on line during manufacture. Inspection of steel pipe used in particularly critical applications such as national defense, offshore oil drilling, and other high pressure installations could also be performed by the CIT scanner. Capitol Asset Management, Inc. (CAM), served as the Partnership's sole general partner from December 1982 through February 1987. CAM, a Texas corporation, was formed on May 6, 1982, by R. T. Pinchback, its incorporator and chief executive officer. Paul Turton, a marketing executive, served as CAM's president. CAM's primary business activity consisted of obtaining venture capital, business formation, and consulting. At some point in 1982, representatives from Scientific *105 Measurement Systems, Inc. (SMS), a Texas corporation, contacted CAM in an effort to locate additional venture capital for the development of CIT technology. Since its formation in 1979, SMS had been engaged in the business of researching, developing, manufacturing, and marketing CIT systems. Dr. Ira Lon Morgan was the founder, president, and director of research and development for SMS. Dr. Morgan held several patents in the field of x-ray tomography. By 1982, SMS had developed, manufactured, and delivered a CIT scanner system capable of nondestructive testing and analysis of concrete and steel structures which were stabilized or positioned for use in the field. However, in 1982, SMS desired to expand the capability of the scanner system to the inspection of hot steel pipe as it moved along the production line at a steel mill. In February 1982, SMS contracted with a market research firm to evaluate the market potential for production line scanner systems. The market study results were encouraging and SMS determined that it needed additional venture capital to pursue the development of the advanced CIT system. At this juncture, SMS representatives contacted and enlisted CAM *106 to seek investors willing to finance the research and development of the production line scanner system. CAM and SMS representatives formulated a plan that would enable SMS to move forward with the development and marketing of the new technology. The plan involved securing funds for research and development by inviting a limited number of sophisticated investors to organize themselves into a limited partnership under the Texas Uniform Limited Partnership Act. Pinchback and Turton, officers of CAM, attracted nine limited partners through the issuance of the Advisory Summary of Scientific Measurement Systems I, Ltd. (Advisory Summary), and the Private Offering Memorandum for Scientific Measurement Systems I, Ltd. The Advisory Summary
The Advisory Summary, dated October 31, 1982, was drafted by Pinchback and Turton. The purpose of the Advisory Summary was to summarize the Partnership's business in advance of the Private Offering Memorandum to be issued in November 1982. The Advisory Summary stated that the Partnership would finance the research and development to be performed by SMS. SMS would research, develop, manufacture, and market the CIT pipe scanner. The Advisory *107 Summary provided that upon completion of the research and development contract, the Partnership would transfer exclusive rights for the technology to SMS. In exchange, the Partnership would receive royalties from SMS based on a percentage of the gross sales of CIT products by SMS. The Advisory Summary noted that SMS had previously contracted for a market study concerning the advanced scanner system and the results were available for investor review at SMS headquarters. The document also stated that SMS planned to continue adding employees to manufacture and market the CIT scanner system. The Advisory Summary further indicated that CAM, the Partnership's general partner, may provide consulting services to SMS from time to time. The Advisory Summary addressed the tax aspects of the Partnership and stated that "the use of Research and Development Limited Partnerships to finance technology development is a relatively new investment vehicle." It noted that Federal tax law relating to research and development limited partnerships may undergo further change or refinement. According to the Advisory Summary, the general partner believed that favorable tax benefits would inure to the *108 limited partners in the form of a sizeable front-end research and development deduction and long-term capital gain treatment for royalty income. The Sessi Letter
The tax aspects of the Partnership's formation and operation were reviewed by W. A. Sessi, an employee of the accounting firm Arthur Anderson & Co. Sessi based his review on the Advisory Summary, partnership agreement, and representations made by the general partner, CAM. The review letter sent from Sessi to CAM (the Sessi letter) reiterated that SMS would perform the research and development work for the Partnership and the Partnership intended to provide an accelerated deduction to its limited partners. The Sessi letter stated that upon completion of the research and development contract by SMS, the Partnership would transfer exclusive rights for the technology to SMS under a technology license agreement and receive royalties in return. Sessi opined that royalty income received by the Partnership from the exclusive license would likely be treated as long-term capital gain income pursuant to section 1235 (transfer of substantial rights in a patent) or section 1221 (qualifying as a capital asset). The following *109 statement appeared under the "Taxation of Royalty Income" heading in the Sessi letter: Section 1221 defines capital assets to mean property other than inventory or assets held for sale in the ordinary course of business. Since this is a one-time transfer, the technology sold to SMS should not be viewed as property held for sale in the ordinary course of business. * * * It could be argued that the technology is not being held for use in a trade or business, since the Partnership is only going to collect royalty income therefrom. [Emphasis added.]
The Sessi letter, dated November 17, 1982, was attached to the package of information supplied to each person solicited to become a limited partner in the Partnership. Each person solicited to become a limited partner in the Partnership also received a Private Offering Memorandum (POM). The Private Offering Memorandum
The Partnership's attorney, Jack Ledbetter, drafted the POM. The POM provided a more detailed description of the business plan set forth in the Advisory Summary. Under the "Allocation of Contributed Funds" heading in the POM the Partnership expected to secure $ 1,250,000 in capital contributions from *110 investor/partners. Approximately 91.8 percent of capital contributions ($ 1,147,500 of $ 1,250,000) were to be paid to SMS under the research and development contract. Expenditures totaling $ 87,500 were designated for syndication commissions and management organization fees. The remaining $ 15,000, 1.2 percent of the total capital contribution, was allocated to accounting and legal fees, filing fees, and reserves. The POM and the Limited Partnership Agreement stated that after the initial capital contribution described above, "no additional capital contributions are contemplated and no Limited Partner shall have any personal obligation for additional contributions." The "Investment Program Summary" section of the POM stated that initial cash contributions to the Partnership should be made by December 20, 1982. However, the general partner was authorized to accept contributions and admit investors through December 27, 1982. After receipt of the necessary capital contributions, but no later than December 30, 1982, the Partnership would be formed and a research and development agreement would be executed between the Partnership and SMS. Contemporaneously with the Partnership *111 formation and SMS research agreement, $ 1,147,500 would be paid to SMS to finance the research and development work. Under the heading "Marketing the CIT Steel Pipe Scanner Systems," the POM stated that "SMS will finance, manage and operate the marketing, sales, field service, and manufacturing operations." It also noted that SMS planned to recruit professional employee sales representatives from the steel industry. The POM provided that all expenses for the development of the commercial product and determining its marketability would be borne by SMS. The general partner, however, would assist SMS in developing a marketing strategy. The Research and Development Agreement (R&D Agreement) between the Partnership and SMS required that SMS prepare and file U.S. patent applications. The Partnership would own the patent rights to the process or product. If a patent appeared probable or a commercially feasible product was developed, the POM stated that SMS would have the exclusive right and option to acquire an exclusive license to market the product for a period not less than the life of the patent. It also provided that "this right shall be the equivalent to a complete conveyance *112 of all patent rights." If SMS failed to exercise its option, the Partnership could sell or grant a license to a third party. The Advisory Summary, Sessi letter, and POM reflect that CAM representatives, Pinchback and Turton, intended and expected that SMS would develop the technology and thereafter have the exclusive right to use, manufacture, market, sell, and lease the product employing the technology. Taxable Years 1982 and 1983
The Partnership was formed in late December 1982. Actual capital contributions made to the Partnership totaled $ 1,196,000. On December 30, 1982, the Partnership executed the R&D Agreement with SMS. Dr. Morgan, as president of SMS, executed the R&D Agreement on behalf of SMS. Contemporaneously with the execution of the R&D Agreement, the Partnership paid SMS $ 1,094,183 to perform the research and development work. The R&D Agreement had a one-year term beginning December 31, 1982, and ending December 31, 1983. The actual performance of the research and development work extended into taxable year 1984. Under the agreement, SMS had to purchase its own equipment, tools, and supplies but retained ownership of the items purchased. SMS was also *113 responsible for preparing and filing U.S. patent applications. The Partnership would own the property rights to all inventions materializing under the R&D Agreement. The R&D Agreement required SMS to use its best efforts in the performance of the research, experimentation, and development activities. In addition, SMS was required to provide the Partnership with quarterly progress reports summarizing the status of the research and development program. During the term of the research and development work, Turton met with SMS representatives on a monthly basis to discuss the progress of any technical developments and to review marketing strategy for the CIT scanner system. Turton did not exercise control over SMS's performance of the research and development work but did remain informed of any progress. In taxable years 1982 and 1983, the Partnership's activity was limited to the general partner's involvement in raising the necessary capital and assistance in the development of SMS's marketing strategy. The U.S. Partnership Return of Income, Form 1065, disclosed the following income and deductions for taxable years 1982 and 1983: Revenues
1982
1983
Interest Income
$     1,698 $ 33,235 Expenses
R&D Expense
$ 1,094,183 Amortization of
Organization Costs
374 4,488 Accounting and Legal Fees
3,000 946 Management Fees-CAM/GP
5,975 4,064 Administrative and
Miscellaneous Expense
473 Interest Expense
31,272 ORDINARY LOSS
($ 1,101,834)
($  8,008)
*114 The Partnership had a$ 4,498 cash balance at the end of 1982 and a $ 678 cash balance at the end of 1983. During 1982 and 1983, the Partnership spent no money on salaries, advertising, office equipment, utilities, rent, or supplies. The General Partner's Annual Report for 1983 disclosed limited activity by the Partnership and primarily focused on the activities of SMS. The annual report noted that SMS had hired a sales manager to direct its marketing program. The report also stated that SMS was working with the Iron & Steel Institute in Washington, D.C., in an effort to persuade the Institute to finance the first installation of the CIT scanner system in a domestic steel mill. Taxable Years 1984 through 1988
In March 1984, SMS completed the research and development work. On April 1, 1984, the Partnership and SMS entered an agreement referred to as the "Exclusive License Agreement with Prior Evaluation Period" (Exclusive License Agreement). The Exclusive License Agreement stated that the Partnership as licensor desired to exploit and commercialize its CIT invention and patent worldwide. The agreement stated that SMS, the licensee, engaged in the business of exploiting *115 and commercializing CIT inventions, and desired to evaluate, manufacture, and market the CIT scanner system. The agreement granted SMS one year to test and evaluate the CIT invention. If SMS determined that the CIT invention was commercially marketable, it had the exclusive right and option to acquire the right and title to and interest in the invention including an exclusive license in all patents and patent rights. If SMS exercised the exclusive license option, it would have the exclusive worldwide right to manufacture, commercialize, and exploit the CIT invention. In consideration for the exclusive license, SMS would pay royalties to the Partnership based on gross revenues from any product developed by SMS as a result of the Partnership R&D Agreement. The Partnership could elect to receive shares of SMS common stock as substitute consideration for royalty payments. During taxable years 1984 and 1985, the Partnership was engaged in virtually no business activity except the occasional marketing assistance provided by Turton to SMS. In 1984 and 1985, Turton served on the SMS board of directors in addition to his position with CAM. In the fall of 1986, Turton accepted a position *116 with SMS as a marketing executive. At some point in 1985 or 1986, Turton requested that the limited partners contribute additional capital to finance the first installation of the new CIT technology. The Partnership and its partners were financially unable to contribute the additional funds needed to finance the first installation. During 1985 and 1986, SMS continually attempted to market the CIT technology and locate financing for the first installation. In the latter part of 1986, SMS decided it would discontinue its effort to manufacture and market the CIT scanner system. In late 1986, Dr. Morgan met with the limited partners of the Partnership and learned they were still interested in marketing the CIT scanner system. Dr. Morgan, recognized as an expert in tomography, resigned from SMS in January 1987. Dr. Morgan subsequently formed IDM Corporation (IDM) and became its president. After hearing that Dr. Morgan resigned from SMS, the American Iron and Steel Institute (AISI) contacted Dr. Morgan to determine whether he still had an interest in installing and testing the scanner system. Dr. Morgan remained interested and entered negotiations with AISI and USX (a division *117 of United States Steel Corp.) regarding the financing, installation, and testing of the first CIT unit. AISI and USX dealt directly with Dr. Morgan and IDM. In March 1987, the Partnership granted IDM a nonexclusive license to manufacture and market the technology. In February 1988, the Partnership and IDM amended the license agreement to grant IDM the exclusive right to manufacture, sell, lease, and market products using the CIT technology. The amended agreement also reduced the royalty percentage that IDM would pay the Partnership from seven to three percent. From the date the Partnership was formed through the date of the trial, the Partnership never sold or leased any product. The only CIT pipe scanning unit installed was installed by IDM and leased by IDM to USX. The Partnership was not involved in the negotiations concerning the USX lease and paid no part of the building costs incurred to install the first CIT unit. The Partnership's only source of income from the technology consisted of royalty payments paid by IDM under the license agreement. OPINION Section 174(a) allows a deduction for "research or experimental expenditures" paid or incurred by a taxpayer during *118 the taxable year "in connection with" the taxpayer's trade or business. Section 1.174-2(a)(2), Income Tax Regs., permits the taxpayer to deduct research and experimentation fees paid to another organization which actually performs the research and development work. Respondent concedes that the expenditures qualified as "research and experimental expenditures" as defined in the section 174 regulations, and agrees that a taxpayer may contract with another organization to perform the research and development work. Respondent contends, however, that the Partnership's expenditures for such research and experimentation were not incurred in connection with a trade or business of the Partnership as required by section 174. In Snow v. Commissioner, 416 U.S. 500, 40 L. Ed. 2d 336, 94 S. Ct. 1876 (1974), the Supreme Court interpreted the phrase "in connection with" a trade or business and concluded that a taxpayer need not currently be producing or selling a product in order to obtain a deduction under section 174. This interpretation of section 174(a)(1) "fairly invited the creation of R & D tax shelters, and the bar quickly took up the invitation." Spellman v. Commissioner, 845 F.2d *119 148, 151 (7th Cir. 1988), affg. T.C Memo 1986-403. Ten years after Snow was decided, this Court in Green v. Commissioner, 83 T.C. 667, 686-687 (1984), provided additional guidance and stated: For section 174 to apply, the taxpayer must still be engaged in a trade or business at some time, and we must still determine, through an examination of the facts of each case, whether the taxpayer's activities in connection with a product are sufficiently substantial and regular to constitute a trade or business * * * [Emphasis in original.]
Green involved a partnership which entered into a research and development agreement and, on the same day, divested itself of all ownership rights in the technology to be developed under such agreement by granting an exclusive, worldwide license of the technology to the research contractor for the patentable life of the technology. By granting an exclusive license to the research contractor, the partnership in Green precluded itself from entering a trade or business as its activities could never surpass those of an "investor." Accordingly, we disallowed the section 174 deduction for the *120 partnership's research and development fee, characterizing the partnership as no more than an "investor" in the business activities of the research contractor. 83 T.C. at 688-689. See also Levin v. Commissioner, 87 T.C. 698 (1986), affd. 832 F.2d 403 (7th Cir. 1987). Unlike the situation in Green, the Partnership in the instant case did not immediately divest itself of all the ownership rights in the technology to be developed under the R & D Agreement. Instead, after the research and development work was completed, the Partnership granted an option to the research contractor to acquire the right to exploit the technology. Therefore, the possibility remained that SMS, the research contractor, would not exercise the option, leaving the door open for the Partnership to enter the trade or business of exploiting the technology. In cases where the partnership grants an option to exploit the technology to another entity, the test for deductibility under section 174 is whether there is a "realistic prospect" that the technology to be developed will be exploited in a trade or business of the partnership. Diamond *121 v. Commissioner, 92 T.C. 423, 439 (1989), on appeal (4th Cir., Oct. 16, 1989); Spellman v. Commissioner, supra; Martyr v. Commissioner, T.C. Memo 1990-558; Coleman v. Commissioner, T.C. Memo 1990-357. Absent such a "realistic prospect," the partnership's section 174 deduction for research and experimental expenditures is disallowed. Thus, mere legal "entitlement" to enter a trade or business is not sufficient to satisfy the "trade or business" requirement of section 174. In assessing the partnership's prospects of entering a trade or business involving the exploitation of the technology, we consider the partnership's intention or capability of entering such trade or business. Diamond v. Commissioner, supra at 439-441; Martyr v. Commissioner, supra; Coleman v. Commissioner, supra.
In the instant case, we acknowledge that the Partnership was legally entitled to enter into the trade or business of manufacturing and marketing the CIT technology. The evidence clearly shows, however, that the Partnership never intended, nor was capable of, engaging *122 in a trade or business with respect to the CIT scanner technology. Stated otherwise, the Partnership never intended to, nor ever did, go beyond the role of a mere investor. The Partnership's intent was clearly and consistently disclosed in the POM, Advisory Summary, and the Sessi letter. Each of these documents set forth a definite plan. SMS contracted and paid for a market study evaluating the commercial viability of a production line scanner system. The Partnership would serve as a financing vehicle by injecting risk capital into SMS's production line scanner system project. SMS would research, develop, manufacture, market, and service the CIT technology. The Partnership intended to grant SMS an exclusive worldwide license and in return receive royalty payments. The POM, Advisory Summary, and the Sessi letter each highlight the proposed tax advantages. The Partnership believed that each limited partner would reap the benefit of a sizeable front-end section 174 deduction along with long-term capital gain treatment of any royalty income. The tax discussion in the Advisory Summary evidences the investor status of the Partnership when it states that "the use of Research and *123 Development Limited Partnerships to finance technology development is a relatively new investment vehicle." The Sessi letter, which was provided to each partner, suggests that the Partnership's royalty income should receive capital gain treatment since a one-time transfer of the technology in exchange for royalty income is arguably not property held for sale in the ordinary course of business. Sessi specifically states: "It could be argued that the technology is not being held for use in a trade or business, since the Partnership is only going to collect royalty income therefrom." The Partnership's lack of intent to enter a trade or business is also evidenced in the Limited Partnership Agreement. The agreement stated that after the initial cash contribution, "no additional capital contributions are contemplated and no Limited Partner shall have any personal obligation for additional contributions." Since the Partnership intended to pay and in fact did pay approximately 91.5 percent of the initial capital contributions to SMS to perform the research and development work, an inadequate amount of working capital remained to operate a trade or business. In fact, under the "Allocation *124 of Contributed Funds" heading of the POM, only two-tenths of a percent was allocated for reserves after considering legal and accounting fees, syndication commissions, management fees, and filing fees. The Partnership's lack of intention or capability to enter a trade or business is also evidenced by its limited cash balance of $ 4,498 at the end of 1982, and $ 678 at the end of 1983. Moreover, during 1982 and 1983, the Partnership spent no money on salaries, advertising, office equipment, utilities, rent or supplies. When requested to contribute additional capital to finance the first CIT scanner installation, the limited partners were financially incapable of covering the costs. From 1982 to 1988, the Partnership engaged in virtually no business activity except for the occasional marketing assistance provided by Turton to SMS. From 1982 up until the date of the trial, the Partnership never sold or leased any product. The evidence clearly reflects that the Partnership merely intended to transfer the rights to the technology in exchange for royalty income. Petitioner argues that Turton's involvement in the supervision of the research and development work and the marketing of *125 the technology constitute sufficient activity for the Partnership to meet the "trade or business" requirement of section 174. Petitioner's suggestion that Turton supervised SMS's research and development work has a hollow ring. The facts indicate that Turton merely kept abreast of the research and development progress by periodically meeting with SMS representatives. Moreover, marketing efforts by Turton were insignificant and to some degree associated with his responsibilities of investment management. We find that Turton's activities on behalf of the Partnership were insufficient to qualify the Partnership as a trade or business within the meaning of section 174. Furthermore, it should be noted that the management of investments is not a trade or business irrespective of the extent of the investments or the amount of time required to perform the managerial functions. Higgins v. Commissioner, 312 U.S. 212, 85 L. Ed. 783, 61 S. Ct. 475 (1941). Accordingly, we hold that the research and experimental expenditures of the Partnership were not paid or incurred in connection with a trade or business as required by section 174. Because of our determination that the Partnership is not entitled *126 to a deduction for the research and experimental expenditures for 1982 and 1983, it is unnecessary for us to determine whether in 1982 the Partnership's note payable became a fixed obligation and thereby entitled the Partnership to deduct the full amount of the note. Decision will be entered for the respondent. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩