PETER A. STANKEVICH, JR., AND MADGE L. STANKEVICH, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Stankevich v. Commissioner
Docket Nos. 19794-84, 4698-85, 35998-85, 16868-86
United States Tax Court
T.C. Memo 1992-458; 1992 Tax Ct. Memo LEXIS 481; 64 T.C.M. (CCH) 460; August 13, 1992, Filed *481 Decisions will be entered for respondent. Ps purchased interests in limited partnerships formed for the purported purpose of engaging in agricultural research and development through a contract with A. Ps made a small initial cash payment and signed a recourse note for the balance. The limited partnerships and A entered into license agreements whereby the limited partnerships granted A licenses to any technology resulting from A's research and development efforts. As a royalty, the limited partnerships received 50 percent profit interests in the crops grown on the acreage allocated to the limited partnerships for research purposes. A conducted no research and experimentation but instead sought to farm commercially. 1. Held: Ps are not entitled to a deduction for research and experimentation expenditures under sec. 174, I.R.C. since A's activities did not constitute research and experimentation. 2. Held further, Ps are not entitled to a deduction for research and experimentation expenditures under sec. 174, I.R.C. because Ps lacked the requisite profit objective and were not engaged directly or indirectly in a trade or business. 3. Held further, the filing *482 of a petition in bankruptcy subsequent to the filing of Ps' Tax Court petition does not under the instant facts deprive this Court of jurisdiction to redetermine Ps' tax deficiency. 4. Held further, Ps are liable for additions to tax for negligence as determined by respondent. 5. Held further, Ps underpayments of tax are attributable to a tax-motivated transaction for purposes of increased interest under sec. 6621(c), I.R.C.
For Petitioners: Frederick R. Schumacher. For Respondent: Rodney J. Bartlett. DAWSON
DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: These cases were assigned to Special Trial Judge Norman H. Wolfe pursuant to the provisions of section 7443A(b)(4) and Rules 180, 181, and 183. [2] The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below. *483 OPINION OF THE SPECIAL TRIAL JUDGE WOLFE, Special Trial Judge: The cases in these consolidated proceedings are the lead cases in a group designated as the Jojoba group of cases. The case of Steven D. Foster and Carolyn S. Foster (petitioners Foster) has been designated as the lead case of the group. The cases of Peter Stankevich, Jr., and Madge Stankevich (petitioners Stankevich), Byron and Jeri Epp (petitioners Epp), and Charles and Ann Eidem (petitioners Eidem) have been designated as subordinate lead cases. Respondent determined deficiencies in and additions to petitioners' Federal income taxes as follows: Petitioners
Docket No.
Year
Deficiency
Peter and Madge
Stankevich, Jr.
19794-84
1980
$ 12,531
Byron and Jeri
Epp
4698-85
1980
2,907
Steven and
35998-85
1981
5,325
Carolyn Foster
Charles and
Ann Eidem
16868-86
1982
2,434
Additions to Tax
Petitioners
Sec.6653(a)
Sec.6653(a)(1)
Sec.6653(a)(2)
Peter and Madge
Stankevich, Jr.
-
-
-
Byron and Jeri
Epp
$ 145
-
-
Steven and
-
$ 266.25
[1]
Carolyn Foster
Charles and
Ann Eidem
-
121.70
[2]
*484 In the statutory notices of deficiency, respondent determined that the provision for increased interest under section 6621(d) applied to petitioners Foster and Eidem. [3] Respondent asserted by answer that petitioners Epp and Stankevich were liable for increased interest under section 6621(c). The issues for decision are: (1) Whether the filing of a bankruptcy petition by petitioners Foster divests this Court of jurisdiction to redetermine their tax liability; (2) whether petitioners are entitled to deductions for research and development expenditures for the years in issue; (3) whether petitioners Foster, Eidem, and Epp are liable for additions to tax for negligence; and (4) whether petitioners' *485 underpayments of tax are attributable to a tax-motivated transaction for purposes of computing increased interest pursuant to section 6621(c). FINDINGS OF FACT Some of the facts have been stipulated, and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. All petitioners resided in California when they filed their respective petitions. Each petitioner was a limited partner in one of four similar California limited partnerships. All of these limited partnerships ostensibly were formed for the purpose of engaging in research and development with respect to use of the jojoba plant for commercial farming purposes. The jojoba plant is a desert shrub native to parts of California, Arizona, and northern Mexico. Jojoba produces a dark brown football-shaped seed, a little larger than a peanut, which contains a liquid wax appropriate for use in lubricants, pharmaceuticals, and cosmetics. Jojoba oil, as the wax commonly is called, is considered a substitute for sperm whale oil, which has been banned in the United States. Jojoba can grow in areas of high temperatures and low humidity, and in soils with high salinity. Jojoba *486 may begin to bear fruit after approximately 3 years. Jojoba plantings may begin to yield commercially harvestable amounts after 5 years. Jojoba is considered an experimental and not a commercial crop. Each of the limited partnerships involved in these cases entered into an agreement with Agra Energy, Inc. (Agra), for Agra to provide agricultural research and development services with respect to the growing of jojoba. None of the four limited partnerships engaged in any activity other than to enter into agreements described herein and transmit payments to Agra. Petitioners Steven D. Foster and Carolyn S. Foster
Petitioners Foster became interested in a limited partnership known as Desert Sun Jojoba 81-5, Ltd., during the latter part of 1981. Steven Foster was employed as a stockbroker while Carolyn Foster operated a coin sales proprietorship called "Money Bags". They reported adjusted gross income of $ 52,205 on their 1981 Federal income tax return. Edward E. Barber was the general partner of Desert Sun Jojoba 81-5, Ltd. According to the private placement memorandum, the general character of the business to be transacted by the issuer (Desert Sun Jojoba 81-5, Ltd.) *487 is to enter into a Research and Development Agreement and a License Agreement with Agra to develop a 50-acre jojoba plantation in the vicinity of Desert Center, California. The offering memorandum contained risk disclosures including warnings of risks associated with investing in a limited partnership. Mr. Barber had no experience in agriculture or in the cultivation of jojoba. He was retired from the military service and was a partner in Advanced Tax Concepts where he marketed numerous limited partnerships in real estate, oil and gas, and agricultural research and development. Desert Sun Jojoba 81-5, Ltd., was promoted through private placement memorandums and by seminars which discussed the tax advantages of an investment in the limited partnership. The private placement memorandums included a copy of the proposed research and development agreement and the proposed license agreement between Desert Sun Jojoba 81-5, Ltd., and Agra. The price of each limited partnership unit was $ 6,000, with a minimum subscription of four units. The $ 6,000 was payable as follows: $ 900 cash; a note for $ 300 bearing no interest and payable February 1, 1982; and a full recourse promissory note *488 for the balance of $ 4,800. The sale of limited partnership units was restricted to persons with a net worth in excess of $ 50,000, gross income for the previous taxable year of not less than $ 25,000, or estimated taxable income during the then-current taxable year which would be subject to a Federal income tax rate of 31 percent or more. Petitioners Foster subscribed for four limited partnership units. They executed a promissory note on November 25, 1981, obligating them to pay $ 1,200 to the partnership on or before February 1, 1982. Additionally, they executed a second promissory note obligating them to pay $ 19,200 to Desert Sun Jojoba 81-5, Ltd. The $ 19,200 note, which was undated, carried a 9-percent interest rate and only the interest and an administration fee was payable for the first 4 years. After the first 2 years, the administration fee increased. The note provided for monthly payments of $ 132 for the first 24 months and $ 188 for the next 24 months. After the first 4 years, petitioners Foster were required to pay $ 493.80 per month and after the sixth year, they were required to make a balloon payment of $ 10,458.48. They made 11 payments on the note. On *489 its face, the $ 19,200 note contained no restrictions on the source of the repayment or nonrecourse features. The Agreement of Limited Partnership and the Certificate of Limited Partnership for Desert Sun Jojoba 81-5, Ltd., were executed on December 24, 1981. The Certificate of Limited Partnership was recorded in the Official Records of Riverside County, California, on December 31, 1981. Desert Sun Jojoba 81-5, Ltd., consisted of one limited partner, Charles P. Perot and Patricia M. Perot and one general partner, Edward E. Barber. On February 10, 1982, Edward E. Barber, as general partner and attorney-in fact for the limited partners, executed an Amended Certificate of Limited Partnership which increased the number of limited partners from 1 to 30 and the initial capitalization of Desert Sun Jojoba 81-5, Ltd., from$ 24,000 to $ 900,000. This Amended Certificate of Limited Partnership was recorded in the Official Records of Orange County, California, on February 18, 1982. Petitioners Foster were among the limited partners. On December 24, 1981, Desert Sun Jojoba 81-5, Ltd., entered into a research and development agreement with Agra. This agreement provided that Agra was "to *490 carry out and perform all development work necessary to develop a 50-acre jojoba plantation * * * in order to perfect the technique of growing the jojoba plant and oil wax therefrom for commercial use". On that same date, the parties purportedly entered into a nonexclusive license agreement providing that Agra would pay to Desert Sun Jojoba 81-5, Ltd., a royalty equal to 50 percent of the net profit generated once the jojoba plantation reached the stage of commercial development. The consideration for the license agreement was to be the technology resulting from the research carried out by Agra under the research and development agreement, as evidenced by written reports furnished by Agra to Desert Sun Jojoba 81-5, Ltd. No executed copy of this agreement was available at the time of trial. With the exception of one report prepared for purposes of trial, no written reports were ever furnished. Desert Sun Jojoba 81-5, Ltd., agreed to pay Agra a downpayment of $ 50,000 at the time of execution of the Research and Development Agreement. An additional payment of $ 45,000 became due on March 1, 1982. Additionally, Desert Sun Jojoba 81-5, Ltd., agreed to payment of a note for $ 720,000 *491 plus interest. The note was payable on a variable scale from less than interest only to amortized payments of principal, all due in 6 years with a balloon payment. The balloon payment due at the end of 6 years could be amortized over an additional 2 years. Utilizing the accrual method of accounting, Desert Sun Jojoba 81-5, Ltd., immediately deducted $ 815,700 on its 1981 partnership return. A proportionate amount of this loss was passed through to petitioners Foster. Petitioners Foster claimed an ordinary loss in the amount of $ 19,577 on their 1981 income tax return as a result of their investment in Desert Sun Jojoba 81-5, Ltd. Desert Sun Jojoba 81-5, Ltd., was late with a portion of the downpayment and the $ 45,000 payment due March 1, 1982. It also fell behind in its obligations under the long-term promissory note. The parties rescheduled payments under the note, but Desert Sun Jojoba 81-5, Ltd., stopped making payments on July 31, 1986, having paid a total of $ 158,800 on the $ 720,000 note. Agra has taken no legal action to enforce collection of the note against Desert Sun Jojoba 81-5, Ltd. Petitioners Foster filed a petition in bankruptcy on September 30, 1985, 1 *492 week after they filed their petition with this Court. On February 13, 1986, petitioners were granted a discharge in bankruptcy. Respondent was listed as a priority creditor but no complaint was filed in the bankruptcy court to decide the dischargeability of the tax claim. Neither Steven or Carolyn Foster appeared or testified at the trial of this case. Petitioners Peter A. Stankevich, Jr., and Madge L. Stankevich
Petitioners Stankevich learned of the limited partnership American Jojoba, Ltd., sometime during 1980 as a result of Peter Stankevich's acquaintance with James Pierce, general partner of American Jojoba, Ltd. Peter Stankevich was employed as an insurance salesman and Madge Stankevich was employed as a librarian by the Long Beach Unified School District. They reported adjusted gross income of $ 56,231 on their 1980 Federal income tax return. James Pierce and Charles Grewer were the general partners and promoters of American Jojoba, Ltd. There is no evidence that either of the general partners had any experience in agriculture or in the growing of jojoba. The stated purpose of American Jojoba, Ltd., like that of Desert Sun Jojoba 81-5, Ltd., was to enter into *493 a research and development agreement with Agra to develop a jojoba plantation in Riverside County, California. The private placement memorandum used to attract investors in American Jojoba, Ltd., was similar to that used by Desert Sun Jojoba 81-5, Ltd. The partnership was marketed through a series of seminars conducted in the Los Angeles area. The tax advantages of the limited partnership investment were discussed at these seminars. The price of each limited partnership unit was $ 10,000, of which $ 750 was a downpayment and the balance was payable in installments. Sale of limited partnership units was restricted to persons with a net worth in excess of $ 50,000 and taxable income during the current taxable year which would be subject to a Federal income tax rate of 25 percent or more. The Agreement of Limited Partnership was dated 1980. This proposed agreement was prepared by handwritten markings written over portions of an agreement used by another partnership. The Certificate of Limited Partnership was executed on February 20, 1981, and recorded in the official records of Orange County, California, on March 4, 1981. The private placement memorandum for American Jojoba *494 Ltd., called for an initial capitalization of $ 1 million and for the development of a 50-acre or more jojoba plantation. A research and development agreement with respect to 50 acres was proposed but not executed. Only 36 limited partnership units were subscribed for a total capitalization of $ 360,000. An Amended Research and Development Agreement was entered into on December 31, 1980, between American Jojoba, Ltd., and Agra. Instead of the 50-acre plantation called for in the original agreement, the amended agreement provided for an 18-acre jojoba plantation. American Jojoba, Ltd., agreed to make a downpayment of $ 10,000 and its general partners signed a promissory note in the principal sum of $ 333,000. This note carried a 10-percent interest rate and payments were $ 2,464.76 per month, commencing February 15, 1981. The monthly payments on the promissory note approximated the interest due on the note. At the end of 8 years, American Jojoba, Ltd., was obligated to make a balloon payment of the balance. The promissory note contained no restrictions or nonrecourse features. American Jojoba, Ltd., made the payments under the note to Agra through September 1987. Under the *495 Research and Development Agreement, dated December 31, 1980, once the jojoba plantation began to produce, American Jojoba, Ltd., was to receive a 50-percent royalty from any commercial sales of jojoba and, in consideration Agra was granted an exclusive license to any technology which was developed. American Jojoba, Ltd., was an accrual method taxpayer and claimed a loss of $ 358,000 on its partnership return for 1980. A proportionate amount of this loss was passed through to petitioners Stankevich. On their 1980 Federal income tax return, petitioners Stankevich claimed a $ 17,902 loss as a result of their investment in American Jojoba, Ltd. Peter Stankevich testified at trial that he never traveled to Riverside County to view their investment. Petitioners Stankevich have never received any profit distributions from their investment in American Jojoba, Ltd. They were current in their payments to American Jojoba, Ltd., at the time of trial. Petitioners Byron J. Epp and Jeri L. Epp
Petitioners Epp invested in a limited partnership known as Desert Sun Jojoba II, Ltd., during the latter part of 1980. During 1980, Byron Epp operated his own commercial door sales business *496 while Jeri Epp was employed as a receptionist. They reported wage and business income in the amount of $ 33,079 on their 1980 Federal income tax return. The general partner of the limited partnership Desert Sun Jojoba II, Ltd., was Clifford M. Jackson. There is no evidence that Clifford Jackson had any experience in agriculture or in the cultivation of jojoba. However, he did obtain articles about jojoba from popular publications. The private placement memorandum for Desert Sun Jojoba II, Ltd., was not available at trial. The certificate of limited partnership states that Desert Sun Jojoba II, Ltd., was formed "to engage in the research development and marketing of the oil of the jojoba plant." This certificate was executed on January 22, 1981, and recorded in the official records of Orange County, California, on January 26, 1981. The certificate of limited partnership was similar to the certificates of the other jojoba partnerships. The total capitalization of Desert Sun Jojoba II, Ltd., was $ 1,100,000 and there were 35 limited partners. Like the other partnerships, Desert Sun Jojoba II, Ltd., was promoted through seminars at which the tax advantages of the investment were *497 discussed. Each unit in Desert Sun Jojoba II, Ltd., cost $ 22,000, with a cash downpayment of $ 3,500, and a $ 1,000 payment due January 9, 1981. The balance, evidenced by an installment note, was payable commencing February 1, 1981. Desert Sun Jojoba II, Ltd., and Agro Energy Corp. (as Agra was then known), entered into an agricultural research and development agreement on October 10, 1980. Desert Sun Jojoba II, Ltd., agreed to pay Agra $ 975,000, consisting of a $ 100,000 downpayment and a promissory note in the amount of $ 875,000, bearing interest of 9 percent and payable monthly commencing February 1, 1981. When the jojoba plantation reached the stage at which the oil (wax) could be sold commercially, then Desert Sun Jojoba II, Ltd., was to receive a royalty equal to 50 percent of Agra's net profits from the sale of the oil (wax). An agreement dated October 10, 1980, stated Agra's exclusive management of the jojoba plantation and granted Agra an exclusive license to any technology which was developed. Desert Sun Jojoba II, Ltd., accrued a deduction in the amount of $ 975,000 and passed a proportionate amount of this loss of petitioners Epp. Petitioners Epp claimed a loss *498 of $ 18,546 on their 1980 income tax return as a result of their participation in the Desert Sun Jojoba II, Ltd., partnership. Desert Sun Jojoba II, Ltd., paid a total of $ 219,600 under the agreement, with the last payment being made on December 31, 1982. Thereafter, Agra and Desert Sun Jojoba II, Ltd., began negotiations and ultimately completed a reorganization on September 30, 1983. Under the reorganization agreement, the limited partners exchanged their partnership interest for stock in Republic Resources, the parent company of Agra. The reorganization was discussed as a possibility during the promotion of the limited partnership. Petitioners Charles P. Eidem and Ann P. Eidem
During 1982, petitioners Eidem received a private placement memorandum with respect to the BMG Petroculture limited partnership. Charles Eidem then worked as a budget analyst for Northrup Corp., and Ann Eidem was employed as a nurse. Petitioners Eidem reported adjusted gross income of $ 38,346 on their 1982 Federal income tax return. The general partner of BMG Petroculture was a partnership, Bean, Moos & Guyette, of which the principals were Bart Bean, J. Michael Moos, and Bruce Guyette. *499 None of the principals of Bean, Moos & Guyette had any experience in agriculture or in the cultivation of jojoba. BMG Petroculture was promoted through a private placement memorandum and through seminars which discussed the tax advantages of an investment in BMG Petroculture. The private placement memorandum was similar to that used by the other partnerships discussed herein. In addition to the usual investment risk disclaimers, the tax aspects of an investment were discussed in detail. The private placement memorandum stated that the general character of the business to be transacted by the issuer (BMG Petroculture) was to enter into a Research and Development Agreement with Agra Energy Corp., to develop a 75-acre jojoba plantation in the vicinity of Blythe, California. The private placement memorandum, dated September 1, 1981, with respect to BMG Petroculture specified total capitalization of $ 881,250. The price of each limited partnership unit was $ 5,875, with a minimum subscription of four units, unless specifically waived by the general partner. The $ 5,875 was payable as follows: A cash downpayment of $ 1,500 and a full recourse promissory note for the balance of $ 4,375. *500 The sale of limited partnership units was restricted to persons with a net worth in excess of $ 75,000 (exclusive of home, furnishings, and automobiles) taxable income for the current year subject to a combined Federal and State income tax at a rate of 32 percent or more, or gross income in the previous taxable year not less than $ 35,000. Petitioners Eidem subscribed to two limited partnership units. Petitioner Charles Eidem testified at trial that he did not consult with any independent expert advisers before he made his investment in BMG Petroculture. Petitioners Eidem never traveled to Blythe, California, to view the project. Petitioners Eidem were current in their payments to BMG Petroculture at the time of trial. The Agreement of Limited Partnership and an amendment thereto are undated and signed only in the name of the partnership. The amendment of the limited partnership agreement served to reallocate the distribution of profits and losses in order to apportion all 1981 losses to limited partners who subscribed during that year and to allocate all net losses of the partnership for 1982 to those partners who had subscribed between January 1, 1982, and January 30, 1982. *501 The certificate of limited partnership for BMG Petroculture was executed on December 31, 1981, and was recorded in the official records of Orange County, California, on that same date. An amended certificate of limited partnership was executed on July 27, 1982, and was recorded in the official records of Orange County, California, on August 23, 1982. This amended certificate raised the number of limited partners from 3 to 17 and the capitalization of the partnership from $ 52,875 to $ 305,000. On December 31, 1981, BMG Petroculture and Agra entered into a research and development agreement which called for Agra to develop a 4-1/2-acre jojoba plantation. BMG Petroculture was to receive a royalty equal to 50 percent of the net profits generated once the jojoba plantation reached a stage of commercial development. While the private placement memorandum calls for a license agreement between Agra and BMG Petroculture, there is no evidence whether such an agreement was, in fact, signed. Under the terms of the research and development agreement, BMG Petroculture agreed to pay Agra a total of $ 46,875, consisting of a cash downpayment of $ 7,500 and a promissory note in the amount *502 of $ 39,375, bearing interest at 10 percent, payable monthly, with a balloon payment at the end of 5 years. The research and development agreement was amended on August 17, 1982, to provide that Agra was to develop a 26-acre jojoba plantation. BMG Petroculture agreed to pay Agra the sum of $ 267,000, consisting of a cash downpayment of $ 39,500 and a promissory note in the amount of $ 188,125 bearing interest of 10 percent. The promissory note was payable on a variable scale with a balloon payment at the end of 5 years. BMG Petroculture was current in its payments to Agra under the note at the time of trial. BMG Petroculture accrued the contract expense and passed through a proportionate amount of the loss to petitioners Eidem. For the 1982 tax year, petitioners Eidem claimed a $ 10,717 loss as a result of their investment in BMG Petroculture. The partners in BMG Petroculture realized some income from their investment in 1985 or 1986 as a result of a harvest of jojoba. None of the other partnerships realized any income from the sale of jojoba. Agra Energy, Inc.
Each of the four limited partnerships in the present cases entered into a research and development agreement *503 with Agra as soon as the partnership was organized and financed. Such an agreement was fundamental to the entire project. Agra was organized in November 1979, by John W. O'Donnell, who served as Agra's treasurer and chief executive officer from the organization of Agra until 1985. John O'Donnell and other Agra personnel lectured regularly at personal investment seminars, including the limited partnerships in this case. Agra is a subsidiary of Republic Resources, Inc., a Texas corporation. Prior to acquiring Agra on December 18, 1981, Republic Resources was a shell corporation, with no business operations, insignificant assets and liabilities, and no source of revenue other than interest earned on certificates of deposit and short-term interest-bearing notes. Republic Resources, Inc., exchanged 88.8 percent of its outstanding shares of common stock for all of the common stock of Agra, which was held by three individuals. Following the exchange, John O'Donnell held 56.2 percent of the outstanding shares of Republic Resources, Inc., and Donel Belsby held 26.4 percent of the outstanding shares. Republic Resources, Inc., operated as a holding company with its subsidiary Agra constituting *504 the bulk of its operations. Agra's income was derived from the sale of agricultural research and development agreements for the cultivation of jojoba. Agra had agricultural research and development agreements with 21 separate limited partnerships involving the growing of jojoba. Agra owned or leased approximately 1,200 acres of land located in Riverside County, California. Some of this land was acquired from Donel Belsby, who at one time was an officer and director of Agra as well as a major investor in the company. After resigning as an officer, Donel Belsby also performed independent contractor services for Agra. Donel Belsby was a farmer and was responsible for clearing and grading the land, erecting fences, and planting and cultivating the jojoba plants. He was compensated for these services as an independent contractor. The terms of the research and development agreements provided Agra with great discretion in its efforts to develop jojoba. Nevertheless, Agra was not accountable if its efforts proved unsuccessful. In the case of petitioners Foster, the agreement provides: "The Contractor [Agra] will use its best efforts to successfully complete the research and development *505 work no later than December 31, 1987; however, the Contractor does not guarantee that its work will be successful." The agreement further provided: "Upon reaching the state at which the oil of the jojoba bean from the aforesaid plantation may be sold commercially, Contractor shall, in its sole discretion, determine the best means of producing such oil and the means of marketing same." The other research and development agreements include similar provisions. Agra selected the specific site of the research and development plot. Agra attempted to farm jojoba commercially. Agra did not distinguish between the individual research plots. Agra simply aggregated the research plots and applied various farming techniques. There was no attempt on the part of Agra to apply different methods to discreet parcels. Agra did not conduct field studies or have any pilot plots within a single farming area with similar soil and climate conditions throughout. Agra provided no reports apprising the partnerships of the status of the research and development work. Donel Belsby, who was petitioners' expert, testified that Agra conducted legitimate research and development by applying different treatments *506 to the geographically separate larger parcels. Agra varied the amount of irrigation water and intercropped the jojoba with Mondale pine, which it intended to sell as Christmas trees. Agra also varied the distance between the rows of jojoba and the amount of fertilizer. Marvin T. Parr (Parr), an employee of respondent, testified as an expert witness for respondent. Parr visited the jojoba plantations on two occasions and inspected the growing jojoba. The testimony of Parr was that Agra's efforts were directed toward a commercial jojoba development. The amounts to be paid to Agra under the research and development agreements were based upon a fixed price per acre. Agra's research and development efforts have not resulted in any patentable technology. While Agra might have varied applications of fertilizer and water, and attempted intercropping, all of its efforts were directed toward farming jojoba. Agra was not engaged in research and development activities. Agra was engaged in farming jojoba. OPINION 1. Jurisdiction Over Federal Income Tax Controversy and Dischargeability in Bankruptcy
Section 362(a)(8) of the Bankruptcy Code provides for an automatic stay prohibiting *507 "the commencement or continuation of a proceeding before the United States Tax Court concerning the debtor." Unless the stay is removed by order of the bankruptcy court, it continues in effect until the earliest of the case closing, case dismissal, or the time a discharge is granted. 11 U.S.C. sec. 362(c)(2) (1988); Neilson v. Commissioner, 94 T.C. 1, 8 (1990). After the automatic stay has been removed, there is no bar to this Court's accepting jurisdiction or continuing a proceeding that had been petitioned prior to the automatic stay. Neilson v. Commissioner, supra. Under 11 U.S.C. section 362, we may acquire or exercise jurisdiction where the bankruptcy case is terminated or the automatic stay is no longer in effect. Id.
In this case the notice of deficiency was mailed and the Tax Court petition was filed before petitioners Foster filed their petition in bankruptcy court. Since petitioners Fosters were discharged in the bankruptcy case on February 13, 1986, and the automatic stay which prevented this Court from exercising its jurisdiction to redetermine petitioners' tax liabilities was lifted, we may exercise jurisdiction on *508 the merits of respondent's income tax deficiency determinations. 11 U.S.C. sec. 362(c)(2)(C). This Court does not have subject matter jurisdiction to determine whether a tax deficiency has been discharged in a bankruptcy proceeding. Moody v. Commissioner, 95 T.C. 655, 658 (1990); Neilson v. Commissioner, supra at 9; Graham v. Commissioner, 75 T.C. 389, 399-400 (1980). That issue falls within the general jurisdiction of the bankruptcy court, and accordingly we do not decide whether the discharge in bankruptcy released petitioners Foster from their liability for respondent's determinations. 2. Research and Development Expenditures
Section 174(a)(1) states, as a general rule, that "research or experimental expenditures which are paid or incurred by * * * [a taxpayer] during the taxable year in connection with his trade or business", may, at the election of the taxpayer, be treated as expenses not chargeable to capital account. The expenditures so treated shall be allowed as a deduction. Sec. 174(a)(1). A taxpayer is entitled to a deduction for research and experimental expenditures with respect to expenses *509 paid or incurred by the taxpayer directly and expenses paid or incurred on the taxpayer's behalf by another person or organization. Sec. 1.174-2(a), Income Tax Regs.
In order for expenditures to be deductible under section 174(a)(1), the expenses must be "research or experimental expenditures" and they must be paid or incurred by the taxpayer during the taxable year in "connection with his trade or business". Petitioners contend that their expenditures here in issue qualify under the statutory standard. Respondent argues that the expenditures in issue were not "research and experimental expenditures" and that petitioners only participated in the limited partnerships as passive investors. Accordingly, respondent argues that petitioners did not incur the expenses in connection with their "trade or business". The term "research or experimental expenditures" as used in section 174 "means expenditures incurred in connection with the taxpayer's trade or business which represent research and development costs in the experimental or laboratory sense." Sec. 1.174-2(a)(1), Income Tax Regs. This regulation further provides: The term [research or experimental expenditures] includes *510 generally all such costs incident to the development of an experimental or pilot model, a plant process, a product, a formula, an invention, or similar property, and the improvement of already existing property of the type mentioned. The term does not include expenditures such as those for the ordinary testing or inspection of materials or products for quality control or those for efficiency surveys, management studies, consumer surveys, advertising, or promotions. * * * Respondent claims that the amounts paid to Agra by all petitioners do not fall within the purview of the quoted regulation and are not deductible under section 174. Respondent argues that the amounts expended by petitioners were incurred only in connection with a farming enterprise and that the objective of the limited partnerships was to conduct commercial farming of jojoba plantations through Agra. Respondent argues that the activities of Agra were, at most, field trials or tests applying jojoba studies by various universities and more likely were simply farming activities directed toward maximizing the crop. Petitioners argue that since land varies a great deal in chemical composition and because research results *511 previously obtained by universities at other locations were applied by Agra to the land and conditions here in question, the expenses incurred are allowable as research and experimental under section 174(a)(1). Attempts to farm jojoba commercially do not represent research and development in the experimental or laboratory sense. Agra farmed jojoba for the oil seed. The limited partners would realize income only through the sale of jojoba oil. Agra did not furnish any status reports on the progress of the research and development nor did Agra maintain a laboratory or conduct research. We agree with respondent's expert witness that Agra's actions were no more than what any farmer would do in the ordinary course of growing a crop. There is no evidence suggesting that Agra's efforts would lead to patentable technology or even know-how. Since petitioners did not directly or indirectly engage in research or experimentation, we hold that they are not entitled to a deduction for these expenditures under section 174. In addition, we hold that the activities of all petitioners did not constitute a trade or business. In determining whether research and development expenditures were *512 incurred in a trade or business, this Court has considered a two-step inquiry: (1) Whether the taxpayer's activities in connection with the venture were sufficiently substantial and regular to constitute a trade or business; and (2) whether the taxpayer had the requisite profit objective in undertaking the activity. See Green v. Commissioner, 83 T.C. 667, 687 (1984). In the cases under consideration, petitioners' activities were not sufficient to constitute a trade or business. Moreover, petitioners did not have the requisite profit objective in undertaking their activities. In Snow v. Commissioner, 416 U.S. 500 (1974), the Supreme Court established that deductions under section 174 could be claimed in connection with a trade or business even though the taxpayer was not currently producing or selling any product. See Levin v. Commissioner, 87 T.C. 698 (1986), affd. 832 F.2d 403 (7th Cir. 1987); see also Green v. Commissioner, supra at 685-686. In following the Snow case, however, this Court has held that to be entitled to a deduction the taxpayer must be engaged in a trade *513 or business at some time and the activities must be sufficiently substantial and regular to constitute a trade or business. Green v. Commissioner, supra at 687-689. The management of investments, however, is not a trade or business, regardless of how extensive or complete the portfolio or how much time is required to manage such investments. Green v. Commissioner, supra at 688-689. This Court has scrutinized claimed research and development expenditures to determine those that are legitimate and those that are merely designed to shelter the income of passive investors. See, e.g., Diamond v. Commissioner, 92 T.C. 423 (1989), affd. 930 F.2d 372 (4th Cir. 1991); Levin v. Commissioner, supra; Green v. Commissioner, supra; Spellman v. Commissioner, T.C. Memo. 1986-403, affd. 845 F.2d 148 (7th Cir. 1988). The controlling inquiry, where a partnership is claiming deductions under section 174, is whether there is a realistic prospect that the technology to be developed will be exploited in a trade or business of the entity in question. *514 See Diamond v. Commissioner, supra.Mere legal entitlement to enter into a trade or business does not satisfy this test. Instead, "The legal entitlement must be backed by a probability of the firm's going into business." Levin v. Commissioner, 832 F.2d at 407. A facts and circumstances test has been employed by this Court in determining whether there is a realistic prospect that a partnership may enter into a trade or business with respect to technology that is to be developed. We have considered such factors as the intentions of the parties involved in the arrangement, the amount of capitalization retained by the partnership during the research and development contract period, the exercise of control by the partnership over the person or organization doing the research, the business activities of the partnership during the year in question, and the experience of the partners. Diamond v. Commissioner, supra at 438-440; Levin v. Commissioner, 87 T.C. at 726-728; Double Bar Chain Co., Ltd. v. Commissioner, T.C. Memo. 1991-572. The grant of an exclusive license to exploit *515 technology prior to commencement of research and development may preclude a licensor from engaging in a trade or business with respect to the technology. Spellman v. Commissioner, 845 F.2d 148 (7th Cir. 1988), affg. T.C. Memo. 1986-403; Levin v. Commissioner, 87 T.C. at 726-727; Green v. Commissioner, supra.In the Green case, a partnership entered into a research and development agreement under which it divested itself of all ownership rights in the technology to be produced under the agreement. We held that the taxpayer's partnership could not have been engaged in a trade or business as it had disposed of all of the incidents of ownership by assigning all its rights in the technology to a third party. Green v. Commissioner, supra at 689. "Following this assignment, the partnership's activities were purely ministerial; the taxpayers were no more than mere investors." Diamond v. Commissioner, 92 T.C. at 438. In Levin v. Commissioner, 87 T.C. at 726-727, we held that the grant of an exclusive license foreclosed the possibility that *516 the licensor could be engaged in a trade or business in connection with the licensed product, as the licensor was deprived of control over the product. "An entity with no control over activities in which it invests is more properly classified as an investor and cannot be engaged in a trade or business in connection with those activities." Diamond v. Commissioner, 92 T.C. at 443. In Diamond v. Commissioner, supra, the partnership granted an option to a research contractor to acquire an exclusive license to the new technology at some future time. Because the option could have been exercised for a relatively nominal amount, we concluded that there was no realistic prospect that the partnership would ever enter any trade or business relating to the technology. Diamond v. Commissioner, 92 T.C. at 440-441. This Court has also disallowed deductions claimed for research and experimental expenditures even though the licenses had not officially been entered into upon execution of the research and development agreements. See Stauber v. Commissioner, T.C. Memo. 1992-128; Double Bar Chain Co., Ltd. v. Commissioner, supra. *517 In Stauber, we found that the partnership never intended to enter into a trade or business with respect to the technology, and that there was a pre-existing understanding regarding a future license of the technology. In Double Bar Chain Co., Ltd., we held that even though there was no written license agreement, the partnership never intended to enter the trade or business of manufacturing and marketing the technology. The relevant factors in this determination include the limited capital retained in the partnership, the private offering memorandum stating that none of the essential activities relating to the technology would be conducted by the partnership, the lack of control over the research activities, and the lack of experience of the investors. Paragraph 2 of the licensing agreement entered into between Desert Sun Jojoba II, Ltd., and Agro (petitioners Epps' investment), and American Jojoba, Ltd., and Agra (petitioners Stankeviches' investment) states: Said agreement provides that upon the determination by Licensee, that the jojoba plantation upon which such research and development will be conducted has reached a state of commercial development, then and in that *518 event Licensee shall exclusively manage said plantation and pay royalty thereto to Licensor. Section B, paragraph 1 of the agreement further provides: During the term hereof, Licensee shall have the exclusive right to utilize the technology developed for the account of the Licensor. Section B, paragraph 2 provides: The license granted hereby shall be exclusive. The passive nature and limited activity of Desert Sun Jojoba II, Ltd., and American Jojoba, Ltd., as well as their lack of control over all of the aspects of the investment, plainly demonstrate that the general partners of Desert Sun Jojoba II, Ltd., and American Jojoba, Ltd., never intended that these partnerships would enter into a trade or business. The contractual arrangements between these partnerships and Agra made the prospects unrealistic that the partnerships would ever be capable of entering into a trade or business with respect to any technology that might be developed. Everything that petitioners Epp and Stankevich did was wholly consistent with investor activity, not the activity of a person engaged in an active trade or business. Although the licensing agreements in the Foster and Eidem cases were *519 not submitted into evidence, the research and development agreements in both cases state that when the farming project reaches the stage at which the oil of the jojoba bean may be sold commercially, exclusive control is granted to Agra to determine the best means of producing the oil and the means of marketing the oil. These agreements support the conclusion that the parties to those agreements never intended that the partnerships would exploit any results of the activities of the partnership or of Agra in a trade or business of the partnership. Furthermore, although it is questionable whether or not license agreements actually were signed in the Foster and Eidem cases, it is clear that at the time the research and development agreements were executed there was an understanding as to the future license. From the evidence presented at trial, as well as the contractual agreements, Desert Sun Jojoba 81-5, Ltd., and BMG Petroculture, due to their passive nature and limited activity as well as their lack of control over the research and development of the project, were no more than mere investors and never intended to enter into a trade or business. Everything petitioners Foster and *520 Eidem did was wholly consistent with investor activity, not the activity of a person engaged in an active trade or business. In addition, to constitute a trade or business an activity must be engaged in with an "actual and honest objective" of making a profit within the meaning of section 183. Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). Whether an activity of a partnership is carried on with a requisite profit objective must be resolved at the partnership level. Brannen v. Commissioner, 722 F.2d 695, 703-704 (11th Cir. 1984), affg. 78 T.C. 471 (1982). When the taxpayer is a limited partner, as in this case, the primary focus is on the actions of the general partner. Finoli v. Commissioner, 86 T.C. 697, 722 (1986); Rosenfeld v. Commissioner, 82 T.C. 105, 112-113 (1984). Section 1.183-2(b), Income Tax Regs., provides a nonexclusive list of factors which should be considered in determining whether an activity is engaged in with the requisite profit objective. The nine factors are: (1) The manner in which the *521 taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used by the taxpayer may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. No single factor, nor the existence of even a majority of the factors, is controlling, but rather it is an evaluation of all the facts and circumstances in the case, taken as a whole, which is determinative. Greater weight is given to objective facts than to a taxpayer's statement of intent. Beck v. Commissioner, 85 T.C. 557, 570 (1985). Here we find no significant or persuasive evidence that Desert Sun Jojoba 81-5, Ltd., or the other partnerships had an actual and honest objective of earning a profit from their investment in jojoba. Neither Desert Sun Jojoba 81-5, Ltd., nor the *522 other partnerships conducted their activities in a businesslike fashion. There was no arm's-length bargaining between the partnerships and Agra. The cost of the purported research and development was based on a fixed price per acre and the partnerships did not and could not exercise control over Agra's activities. Agra's employees and officers assisted in the promotion of these partnerships and clearly influenced the activities of the partnerships. The partnerships failed to maintain their records in a businesslike fashion. Key documents could not be located or were incomplete. Neither petitioners nor the general partners had any expertise in agricultural research, farming, or the growing of jojoba. Petitioners did not take any significant steps to familiarize themselves with jojoba. The general partners of the partnerships were expert in the marketing of tax shelters. The record is replete with evidence of the general partners' background in arranging tax-motivated transactions. Only one general partner made even a minimal effort to familiarize himself with jojoba farming and that effort was limited to reading articles found in readily available magazines. Desert Sun Jojoba *523 81-5, Ltd., and the other partnerships took no active part in the activity other than to forward payments to Agra. There is no evidence that the general partners or the limited partners ever inspected Agra's activities. At best, petitioners had only an investment interest. There could be no expectation that underlying assets would appreciate in value. Under the terms of the agreements between the partnerships and Agra, the partnerships gave up their interest in the research which Agra purportedly conducted. The partnerships acquired no interest in the land or the growing jojoba. The partnerships simply owned a 50-percent royalty in the jojoba oil produced for 20 years. With the exception of one small distribution by BMG Petroculture, none of the partnerships realized any income from their investment. None of the 21 partnerships that Agra contracted with were profitable. There is no evidence that any of them ever had a successful harvest. Taken as a whole, the facts and circumstances of these cases demonstrate that the partnerships in question were in the nature of yearend tax shelters marketed to individuals who considered the immediate tax benefits available to them. Neither *524 the structuring of the transactions in question nor the activities of the partnerships show an actual and honest objective to make a profit. Instead, the objective was to make a deduction under section 174 available to investors without actually conducting the appropriate research or requiring immediate full payment of the amount deducted. 3. Section 6653(a) Additions to Tax
Respondent determined that petitioners Foster and Eidem are liable for additions to tax for negligence or intentional disregard of rules and regulations under section 6653(a)(1) and (2). Respondent determined that petitioners Epp are liable for the addition to tax for negligence or intentional disregard of rules and regulations under section 6653(a). Negligence is defined as the failure to exercise the due care of a reasonable and ordinarily prudent person under like circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Petitioners have the burden of proving that respondent's determinations of additions to tax are erroneous. Rule 142(a); Luman v. Commissioner, 79 T.C. 846, 860-861 (1982). While petitioners claim to have engaged in the research and *525 development of the jojoba plant, they had no experience or expertise in this field and paid little attention to their investment. Petitioners Foster and Epp did not testify at trial. Petitioner Charles Eidem admitted that he did not view the jojoba and never received any progress reports with respect to the jojoba program. There is no evidence in the record that petitioners sought the advice of an independent expert with respect to the research and development of jojoba. The actions of petitioners Foster did not satisfy the standard of care which reasonable and ordinarily prudent persons would have taken under the circumstances. See Neely v. Commissioner, supra. Accordingly, those petitioners are liable for the additions to tax under section 6653(a) or where applicable, section 6653(a)(1). Petitioners Foster and Eidem are also liable for the additions to tax under section 6653(a)(2). 4. Section 6621(c) Tax-Motivated Transactions
The final question here is the interest imposed on tax-motivated transactions by section 6621(c). The increased rate of interest is 120 percent of the statutory rate imposed on underpayments if the underpayment exceeds *526 $ 1,000 and is attributable to a tax-motivated transaction (as defined in section 6621(c)(3)). The increased interest is effective only with respect to interest accruing after December 31, 1984, notwithstanding that the transaction was entered into prior to that date. Solowiejczyk v. Commissioner, 85 T.C. 552 (1985), affd. per curiam without published opinion 795 F.2d 1005 (2d Cir. 1986). Respondent determined that the increased interest under section 6621(c) applied to petitioners Foster and Eidem. Respondent also asserted in the answer or by amended answer that the increased interest under section 6621(c) applied to petitioners Epp and Stankevich. Respondent has the burden of proof with respect to the increased interest asserted in the answer or by amendment to the answer. Rule 142(a); Zirker v. Commissioner, 87 T.C. 970, 981 (1986). Respondent contends that the increased rate of interest under section 6621(c) applies because the research and development expense deductions which all petitioners claimed resulted in a "substantial underpayment" attributable to a tax-motivated transaction. Section 6621(c)(3)(A) enumerates *527 types of transactions which are to be considered "tax-motivated transactions". Furthermore, section 6621(c)(3)(B) gives the Secretary of the Treasury authority, by regulation, to add to the categories of transactions that will be treated as tax-motivated transactions. We have applied this regulation in similar situations. See, e.g., Helba v. Commissioner, 87 T.C. 983, 1015 (1986), affd. without published opinion 860 F.2d 1075 (3d Cir. 1988); Stanley Works and Subsidiaries v. Commissioner, 87 T.C. 389, 420-421 (1986). Section 301.6621-2T, Q & A-4(1), Temporary Proced. & Admin. Regs., 49 Fed. Reg. 50391 (Dec. 28, 1984), provides that any deduction disallowed under section 183 relating to an activity engaged in by an individual or an S corporation that is not engaged in for profit is deemed to be tax motivated. Since we have found that petitioners' activities were not engaged in for profit, we hold that such activities are tax-motivated transactions. Accordingly, respondent's determination as to the applicable interest rate for deficiencies attributable to tax-motivated transactions is sustained and the increased *528 rate of interest applies for the taxable years in issue. To reflect the foregoing, Decisions will be entered for respondent. Footnotes
1. The following cases were consolidated herewith for purposes of trial, briefing, and opinion: Byron J. Epp and Jeri L. Epp, docket No. 4698-85; Steven D. Foster and Carolyn S. Foster, docket No. 35998-85; and Charles P. Eidem and Ann P. Eidem, docket No. 16868-86. Although these cases are captioned as indicated above, in the names of petitioners having the earliest docket number, the case involving the Fosters was designated as the lead case of this group.↩
2. All section references are to the Internal Revenue Code in effect for the tax years in issue, except as otherwise indicated. All Rule References are to the Tax Court Rules of Practice and Procedure.↩
1. 50 percent of the interest due on $ 5,325. ↩
2. 50 percent of the interest due on $ 2,434.↩
3. The deficiency notices in the Foster and Eidem cases refer to sec. 6621(d). Amendments to answer in the Stankevich and Epp cases refer to sec. 6221(c). Prior to the Tax Reform Act of 1986, subsec. (c) was designated subsec. (d). Pub. L. 99-514, sec. 1511(a), 100 Stat. 2085, 2744. All further references are to sec. 6621(c)↩.